UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------x

6/17/14

AWILDA IVETTE CORDERO,

                    :

          Plaintiff,              **REPORT & RECOMMENDATION**

                    :

         -against-         11 Civ. 8164 (JGK)(MHD)

                    :

CAROLYN W. COLVIN,
COMMISSIONER OF SOCIAL SECURITY, :

           Defendant.     :
--------------------------------x

TO THE HONORABLE JOHN G. KOELTL, U.S.D.J.:

Plaintiff Awilda Cordero has filed this pro se action pursuant to section 205(g) of the Social Security Act ("the Act"), 42 U.S.C. § 405(g), challenging the October 11, 2011 final decision of the Social Security Administration ("SSA") to deny her application for disability insurance benefits and Supplemental Security Income ("SSI") benefits. Plaintiff had applied for disability benefits and SSI benefits on October 16, 2010, claiming she was unable to work because of major depression, anxiety, paranoia, delusions, and mood swings.

Defendant, the Commissioner of Social Security, has moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons set forth below, we recommend that defendant's motion be denied and that this case be

1

remanded for further administrative consideration of plaintiff's benefits application.

## Procedural History

Plaintiff's first application for Social Security disability benefits, alleging a disability onset date of September 15, 2008, was denied on June 18, 2010.[1] (Tr. 12, 13). Plaintiff declined to appeal this decision, making it final and not subject to further review. (See id.).

Plaintiff filed a subsequent application for disability insurance benefits and SSI benefits on October 16, 2010, amending her disability onset date to January 1, 2010. (Id. at 103-12). On January 7, 2011, the SSA wrote to inform plaintiff that her application had been denied. (Id. at 51-62). On January 21, 2011, plaintiff filed a written request for a hearing before an Administrative Law Judge ("ALJ"). (Id. at 64).

---

[1] Neither this application for benefits, nor its denial, are contained in the administrative record, so it is unknown when plaintiff filed her first application for benefits. Plaintiff's representative at the hearing reported that this claim was denied because plaintiff's earnings at that time qualified as substantial gainful activity. (Id. at 12, 36, 126-27).

The hearing was held before ALJ Mark Solomon on May 10, 2011. (Id. at 10-30, 36). The plaintiff was represented by counsel (id. at 10), who amended plaintiff's alleged disability onset date to June 19, 2010. (Id. at 12-13, 36).

On July 15, 2011, ALJ Solomon issued his decision. Having determined that plaintiff retained her insurance coverage through December 31, 2014, he found that, for purposes of the Act, plaintiff was not disabled and therefore was not entitled to receive benefits. (Id. at 36-48). On July 28, 2011, plaintiff filed an appeal with the SSA, requesting that the Appeals Council review the ALJ's decision. (Id. at 101). On October 11, 2011, the Appeals Council denied plaintiff's request for review, making the ALJ's decision final. (Id. at 1-6).

## FACTUAL BACKGROUND

## I. Non-Medical Evidence Before the Administrative Law Judge

Plaintiff was born on May 14, 1951, in Puerto Rico. (Admin. Tr. ("Tr.") at 14). She completed the 11th grade in Puerto Rico and later received a GED there (id. at 14, 465) before moving to New York more than twenty years ago. (See id. at 14, 131).

3

Plaintiff's primary language is Spanish, and she describes her English proficiency as "medium." (Id. at 14).

Plaintiff worked from approximately 1995 to 2008 as a home health aide. (Id. at 16, 131, 173). She reported working at this job eight hours per day, five days per week. (Id. at 131). Plaintiff testified before the ALJ that she had stopped working as a home aide because she found the work depressing, she found the patients difficult to deal with, and she had trouble getting up early. (Id. at 17).

In 2009, plaintiff worked for her landlord, helping to rent apartments in her building. (Id. at 15). Plaintiff reported doing this work for less than a full year. (Id. at 16). She stopped this work because she was getting "more sick," she felt paranoid, and she did not like leaving her apartment. (Id.).

At the time of the hearing before the ALJ, plaintiff lived in Manhattan with her daughter, an eighteen-year-old college student, and her twenty-five-year-old son, who was not working regularly. (Id. at 14, 17, 22). Plaintiff reported relying on her children for help with almost all daily tasks. (Id. at 18). She also

4

testified that she was unable to take public transportation because of a fear of crime and terrorism. (Id. at 20-21).

## II. Medical Evidence Before the Administrative Law Judge

### A. Prior to Onset Date of June 19, 2010

#### 1. St. Luke's Roosevelt Hospital

On November 14, 2007, plaintiff was brought by her daughter and a roommate for a psychiatric evaluation at St. Luke's Roosevelt Hospital after exhibiting paranoia and delusions. (Id. at 166). Specifically, she reported believing that she is Fidel Castro's daughter and that two men were "after her" and that she had a "mission to accomplish" given to her by her father. (Id.). According to the admitting documentation, plaintiff's symptoms reportedly started a few days before she was brought in and began after her son was arrested for drug-related issues. (Id.). The report states that plaintiff was "disorganized, talks about voices and visions but very tangential and evasive, unable to focus to distinguish between voices/vision" and that she stated that she had received messages from a TV about these issues. (Id.).

5

Plaintiff also reported that she felt "very paranoid" about her ex-boyfriend as well as her current roommate, who she believed were spies. (Id. at 167).

According to this form, plaintiff had been hospitalized at Bellevue Hospital in 1981 for three months for a psychotic episode, followed by outpatient treatment for one year. (Id. at 166). Plaintiff denied having treatment since that time. (Id.). Plaintiff's medical history showed a hysterectomy in 2006, along with liposuction and lumpectomy procedures of unspecified date. (Id.). Plaintiff reported using alcohol, marijuana, and cocaine, but claimed that three individuals were trying to put cocaine into her system. (Id. at 167). She denied past abuse or suicide attempts. (Id.).

The form described the plaintiff's mental status as impaired and delusional. (Id. at 167, 168). She suffered from both auditory and visual hallucinations and delusions (somatic, paranoid, grandiose, ideas of reference). (Id.). Plaintiff's eye contact was wandering and her attitude was guarded and suspicious, although her hygiene was adequate. (Id.). Plaintiff's mood was sad/depressed, anxious, and irritable. (Id.). She denied suicidal or homicidal ideations. (Id.). Her diagnosis under the five-axis

6

diagnostic model[2] was Psychotic Disorder NOS on Axis I, Personality Disorder NOS on Axis II, the recent arrest of her son on Axis IV, and a GAF score of 30 on Axis V.[3] (Id.).

The following day, plaintiff underwent a Psychiatric Inpatient Evaluation. (Id. at 157-65). She reported that her father was schizophrenic and that her grandmother had committed suicide. (Id. at 160). She also reported physical abuse, both by her ex-husband and by her then-current boyfriend. (Id. at 159). The evaluation states that she continued to have grandiose delusions about being Fidel Castro's daughter, but also admitted to homicidal ideations. (Id. at 157, 160). Plaintiff reportedly thought about

---

[2] This style of diagnosis reflects the use of the DSM model published by the American Psychiatric Association. See Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV-TR") 27 (4th edition Text Revision 2000). Axis I refers to clinical disorders; Axis II refers to personality disorders; Axis III refers to general medical conditions; Axis IV refers to psychosocial and environmental contributing factors; Axis V refers to a Global Assessment of Functioning (GAF).

[3] A patient's GAF score quantifies symptoms according to a hypothetical continuum of mental-health illness. A score in the 21-30 range corresponds to "Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas(e.g., stays in bed all day; no job, home, or friends)." See https://www.msu.edu/course/sw/840/stocks/pack/axisv.pdf, last visited June 13, 2014.

"shooting all the bad men," including some of her neighbors, if she had a gun. (Id. at 160-61). She denied currently hearing or seeing hallucinations, but stated that 23 years before she had had an auditory hallucination during which she heard voices telling her to kill her husband and calling her outside to be crucified on a cross. (Id. at 159).

The Psychiatric Inpatient Evaluation noted that plaintiff was oriented in all spheres and well groomed, had good eye contact and had a regular rate of speech. (Id. at 161-62). Plaintiff exhibited poor judgment, a disorganized and tangential thought process, paranoia, and delusions. (Id. at 161). She denied recent hallucinations. (Id.). The evaluation includes an Axis I diagnosis of schizophrenia. (Id. at 164). The treatment plan called for plaintiff to be discharged two weeks later and return home with outpatient psychiatric care. (Id. at 165).

On November 29, 2007, plaintiff was discharged from St. Luke's Roosevelt Hospital. (Id. at 156). The Discharge Information Form reported that plaintiff's course of treatment was to include observation one-on-one and in group and a drug regimen beginning at 1 mg of Resperidone twice daily, later increased to 3 mg twice daily. (Id.). According to the form, during plaintiff's in-patient

8

treatment she "gradually improved [and] gained insight and judgment in her mental illness." (Id.). At discharge, plaintiff was able to identify delusions and was no longer psychotic or delusional. (Id.). Plaintiff agreed to continue outpatient treatment. (Id.).

## 2. **NY Presbyterian Hospital**

On June 8, 2009,[4] plaintiff's boyfriend Frank brought her to the Emergency Room at NY Presbyterian Hospital. (Id. at 183). The Emergency Department Note reports that plaintiff was under stress from her son's pending court date. (Id.) Earlier in the day, plaintiff had complained of chest pain, arm pain and rapid heartbeat. (Id.) Plaintiff told Frank that she had not slept at all the previous night. (Id.). Frank denied that plaintiff had displayed suicidal/homicidal ideations or hallucinations. (Id.). Frank did not know if plaintiff was taking any medication other than Ambien. (Id.).

---

[4] The administrative record does not contain any records dated between November 29, 2007 and June 8, 2009.

The following morning, post-graduate student Dirk Winter, in consultation with Dr. Blatter (first name unknown), evaluated plaintiff. According to the ER Progress Note, plaintiff reported that since her hospitalization two years prior, she had been treated by Dr. Hilda Brewer[5] at Upper Manhattan Hospital. She stated that she had not been taking her prescribed medication (Abilify) because she felt that she did not need it, but she had continued to refill the prescription, and her doctor believed that she was compliant. (Id. at 181). Plaintiff wanted treatment for physical symptoms, but she did not want to be admitted or to undergo psychiatric care. (Id.). Plaintiff refused an evening dose of Abilify and slept very little overnight, but reported high energy in the morning. (Id.). The progress note states that plaintiff had a past diagnosis of paranoid schizophrenia, one hospitalization 20 years prior and a recent hospitalization two years prior. (Id.).

The Progress Notes contain observations and an indication of plaintiff's diagnosis.  Plaintiff was neatly groomed, alert, with rapid speech and a "very good" mood. (Id.). She again denied

---

[5] Mr. Winter references a "Dr. Bruder" in his progress note; however, it is probable, given the rest of the record, that he is referring to Dr. Brewer.

suicidal/homicidal ideations or hallucinations, and she denied concerns about the Mafia. (Id.). Mr. Winter's impression was that plaintiff was manic when noncompliant with medication and outpatient treatment. (Id.). His impression on the five-axis diagnostic model was mood disorder/psychotic disorder not otherwise specified on Axis I, deferred on Axis II, Fibroids on Axis III, conflict with boyfriend and pending trial of son on Axis IV, and a GAF score of 40 on Axis V.[6] (Id.). The Impression suggests a likely need for admission given the escalating symptoms and a suggested change in medication. (Id.).

Later on June 9, 2009, Dr. Blatter decided to discharge plaintiff. (Id. at 180). The hospital called plaintiff's treating psychiatrist, Dr. Brewer, and plaintiff agreed to an outpatient follow-up appointment with her. (Id.) The hospital also spoke with plaintiff's daughter and boyfriend, who both denied that plaintiff

---

[6] A GAF score in the 31-40 range corresponds to "Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." See https://www.msu.edu/course/sw/840/stocks/pack/axisv.pdf, last visited June 13, 2014.

11

was exhibiting suicidal or homicidal ideation or planning, but confirmed that they were both worried about her "weird" and "irrational" behavior. (Id.)

### 3. **Upper Manhattan Health Center**

Plaintiff saw her treating psychiatrist Dr. Hilda Brewer on January 4, 2010, for a Treatment Plan Review.[7] (Id. at 311). Plaintiff's diagnosis was a mood disorder on Axis I, deferred on Axis II, and a GAF score of 60 on Axis V.[8] (Id.). Plaintiff showed no suicidal or homicidal ideations, no current drug abuse, and no change in, or additional, mental status symptoms. (Id.). Dr.

---

[7] This is the earliest medical report from Dr. Brewer or Upper Manhattan Health contained in the Administrative Record. However, this Treatment Plan Review lists a previous Mental Status exam on March 25, 2009. (Id. at 311). As already noted, when plaintiff spent time at NY Presbyterian Hospital in June 2009, Dr. Brewer was already her treating psychiatrist. (Id. at 180). Also, Dr. Brewer's May 4, 2011 Psychiatric Review Technique lists an assessment period from August 21, 2009 to May 3, 2011. (Id. at 372).

[8] A GAF score in the 51-60 range corresponds to "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." See https://www.msu.edu/course/sw/840/stocks/pack/axisv.pdf, last visited June 13, 2014.

Brewer's functional assessment gives plaintiff's level of impairment as Moderate for each listed category: Health, Social/Interpersonal, Educational/Vocational, Money Management, and Leisure (hobbies, interests, etc.).[9] (Id.). According to Dr. Brewer, plaintiff had made progress but still required medication management and psychotherapy to maintain psychiatric stability. (Id. at 315).

On March 5, 2010, Dr. Brewer completed a Psychiatric Evaluation Update for plaintiff. (Id. at 275). Plaintiff had failed to take her Abilify medication for the prior month because she had lost her last prescription. (Id.). Plaintiff's speech was normal, but her mood was anxious and unstable. (Id.). She suffered from delusional thought content, fearing that drug dealers in her area were trying to harm her. (Id.). She was oriented x 3 and had fair attention span and concentration, impulse control, and insight and judgment. (Id. at 276-77). Plaintiff denied suicidal or homicidal ideations, as well as hallucinations. (Id. at 276). Dr. Brewer diagnosed plaintiff as suffering from a mood disorder on Axis I, occupational and economic problems on Axis IV, and a GAF score of

---

[9] The Functional Assessment area of the Treatment Plan Review form lists an impairment scale of: (1) None, (2) Mild, (3) Moderate, (4) Severe, (5) Extreme. (Id. at 311).

13

50.[10] (Id. at 277). Dr. Brewer adjusted plaintiff's dose of Abilify to stabilize her after a month of medication noncompliance. (Id.).

On April 2, 2010, Dr. Brewer completed a Treatment Plan Review. (Id. at 303). She diagnosed plaintiff with a mood disorder on Axis I, deferred on Axis II, economics on Axis IV, and a GAF score of 60. (Id.). Plaintiff denied suicidal or homicidal ideations and any drug use. (Id.). Dr. Brewer's functional assessment was moderate in all categories: Health, Social/Interpersonal, Educational/Vocational, Money Management, and Leisure (hobbies, interest, etc.). (Id.). Dr. Brewer noted that plaintiff had made progress but still required medication management and psychotherapy to maintain psychiatric stability. (Id. at 309).

Plaintiff saw an unidentified therapist on April 19, 2010.[11] (Id. at 421). She complained of an inability to sleep. (Id.). The

---

[10] A GAF score in the 41-50 range corresponds to "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." See https://www.msu.edu/course/sw/840/stocks/pack/axisv.pdf, last visited June 13, 2014.

[11] The signature for the psychiatrist on this form is unintelligible. (Id. at 421, 293). This level of penmanship is

14

therapist noted that plaintiff appeared anxious and recommended that she continue her medication. (Id.).

Plaintiff saw therapist Cecilia Miller on April 20, 2010. (Id.). She reported being depressed, exacerbated by problems at home. (Id.). Her son had been released from prison but had moved in with his girlfriend, and plaintiff's daughter was planning to move out in order to live at college. (Id.). Plaintiff denied current suicidal/homicidal ideations but admitted that she had threatened her daughter with harming herself. (Id.). Plaintiff discussed the problem of medication compliance and agreed to take her medication as prescribed. (Id.).

Plaintiff saw Ms. Miller on April 26, 2010. (Id. at 422). She reported feeling better since restarting her medication despite problems with a ringing in her ear. (Id.). Plaintiff reported spending time walking and going to the park. (Id.).

Plaintiff saw Ms. Miller again on May 6, 2010, and reported being depressed as a result of conflict with her daughter. (Id. at 423). She recounted that she had wanted to phone her therapist,

_____

consistent with the rest of the report, which is only barely legible.

15

but had been afraid of being hospitalized. (Id.). Plaintiff saw
Ms. Miller once again on May 12, 2010. (Id. at 423). She was
depressed because neither of her children had spent Mother's Day
with her, and she reported having paranoid ideations and hearing
pounding on the walls when she was home alone. (Id.). Plaintiff
missed her appointment with the therapist on May 19, 2010, and did
not call to cancel. (Id. at 424).

Plaintiff met with Dr. Brewer on May 28, 2010. (Id.). She had
exhausted her psychiatric medication on May 19, 2010, and continued
to hear noises, as if someone were banging on her walls. (Id.).
Plaintiff's mood was anxious and she reported continued problems
with her children. (Id.).

Plaintiff saw Ms. Miller on June 11, 2010, and complained
about chest and back pain, for which she was taking a muscle
relaxer prescribed to her daughter. (Id. at 425). Plaintiff
continued to suffer from depression, anxiety, and increased
appetite that she attributed to financial difficulties. (Id.).
Plaintiff saw Ms. Miller again on June 15, 2010. (Id. at 426). She
was no longer suffering from chest pains and had stopped taking
her daughter's muscle relaxer medication. (Id.). Plaintiff and her

16

therapist discussed her daughter's pending high school graduation and plaintiff's concerns about living alone in the future. (Id.).

## B. **Medical Evidence During the Time Period of June 19, 2010 to May 4, 2011**

### 1. **Upper Manhattan Health Center**

Plaintiff saw Dr. Brewer on June 25, 2010 for a therapy session. (Id. at 427). Dr. Brewer noted that plaintiff was mildly anxious and afraid. (Id.). Plaintiff was nervous about both her daughter's father visiting from Florida for her daughter's high school graduation and her own father undergoing surgery. (Id.).

Plaintiff met with Ms. Miller on June 30, 2010 after missing an appointment on June 24, 2010. (Id. at 426, 427). She discussed her fear of her daughter's father based on a history of abuse. (Id.). Plaintiff was anxious and complained of heart palpitations. (Id.).

Dr. Deepika Singh, a psychiatrist, completed a Treatment Plan Review on July 2, 2010. (Id. at 295). Dr. Singh diagnosed plaintiff with a mood disorder on Axis I, deferred on Axis II, allergy to

17

penicillin and uterus removal due to fibroids on Axis III, occupational and economic problems on Axis IV, and a GAF score of 60 on Axis V.[12] (Id.). Dr. Singh's functional assessment of plaintiff was moderate in all categories: Health, Social/Interpersonal, Educational/Vocational, Money Management, and Leisure (hobbies, interest, etc.). (Id.). Plaintiff required continued medication management and psychotherapy. (Id. at 301).

Plaintiff saw Ms. Miller on July 8, 2010, where she presented as stable, coherent and calm. (Id. at 428). Plaintiff stated that her sleep had improved, that she was less symptomatic recently and that she was accompanying her daughter to physical therapy appointments. (Id.). Plaintiff missed appointments with Ms. Miller on July 16, 2010 and with Dr. Brewer on July 23, 2010. (Id. at 428, 429).

Plaintiff saw Ms. Miller on July 26, 2010, where she discussed a verbal altercation that she had had with another woman in her neighborhood. (Id.). Ms. Miller noted that plaintiff was anxious and encouraged her to socialize. (Id.).

---

[12] See n.8, supra.

18

Plaintiff saw Dr. Brewer for a clinic appointment and medication evaluation on August 9, 2010. (Id. at 430). She had been without medication since July 26, 2010, after missing her appointment. (Id.). Plaintiff continued to attend her daughter's physical therapy appointments. (Id.).

Plaintiff again saw Ms. Miller on August 30, 2010. (Id. at 431). She was calm and had begun volunteering at the local Catholic Church because she found it "spiritually rewarding." (Id.). Plaintiff discussed her feelings about a recent incident between her daughter and a group of neighborhood girls and her daughter's decision to attend school upstate. (Id.). Ms. Miller notified plaintiff that she would be leaving Upper Manhattan. (Id.). Plaintiff failed to attend her next appointment with Ms. Miller on September, 9, 2010, and did not call to cancel. (Id.). Ms. Miller noted that plaintiff would begin seeing a new therapist. (Id.).

Plaintiff saw Dr. Brewer for a medication evaluation on September 13, 2010. (Id. at 432). She admitted not taking her medication for the prior month and planned to begin working as a home health aide again due to "severe economic problems". (Id.).

19

On October 2, 2010, plaintiff saw an unknown psychiatrist at Upper Manhattan Health Center for a Treatment Plan Review. (Id. at 287). The doctor diagnosed plaintiff with a mood disorder on Axis I, [illegible] on Axis II, allergy to penicillin and uterus removed due to fibroids on Axis III, interpersonal and economic problems on Axis IV, and a GAF score of 60 on Axis V.[13] (Id.). She denied suicidal or homicidal ideations and current drug use. (Id.). The doctor's Functional Assessment was Moderate in all areas: Health, Social/Interpersonal, Educational/Vocational, Money Management, and Leisure (hobbies, interest, etc.). (Id.). The doctor concluded that plaintiff had made progress in treatment but still required medication management and psychotherapy to sustain adaptive functioning at baseline. (Id. at 293).

Plaintiff's record includes a progress note dated October 4, 2010, indicating that Roosevelt Hospital had called about plaintiff's hospitalization on that date. (Id. at 433). See pp. 32-33, infra. Plaintiff was brought to the Roosevelt emergency room by her family because she was exhibiting bizarre behavior, and she was later admitted to the psychiatric unit. (Tr. 433).

---

[13] See n.8, supra.

20

Plaintiff was released after two and a half weeks in the hospital, where she was diagnosed with schizophrenia - paranoid type, and discharged on October 20, 2010. (Id. at 211, 433). In the wake of plaintiff's release, she saw Dr. Brewer for a medication evaluation on October 26, 2010. (Id. at 435). Dr. Brewer gave her medication for the following week, with a follow-up appointment scheduled to reevaluate the medication. (Id.). Plaintiff failed to attend her follow-up medication evaluation with Dr. Brewer on November 1, 2010. (Id.). She did see her new therapist, Mark Sanchez, on November 4, 2010. (Id. at 436). Plaintiff was anxious and agitated; Mr. Sanchez questioned whether plaintiff was experiencing manic symptoms. (Id.).

Plaintiff saw Dr. Brewer for a medication evaluation on November 5, 2010. (Id. at 437). She reported that she had been taken to Roosevelt Hospital the prior Sunday as a result of "rigidity" related to her Abilify medication. (Id.). She also mentioned a number of sexual assaults in the prior year that she had not reported to the police. (Id.).

Plaintiff was again hospitalized on November 6, 2010, after claiming that she had been subjected to sexual assaults perpetrated by drug dealers. (Id.). She admitted to using alcohol and cocaine,

21

and not taking her medication. (Id. at 438). The administrative record includes a progress note indicating a call from St. Vincent's Hospital Westchester to Upper Manhattan Health Center on November 12, 2010. (Id.). Dr. Brewer recommended that plaintiff be released from the hospital and enter a day treatment plan. (Id. at 438).

Plaintiff saw Mr. Sanchez on November 17, 2010. (Id. at 439). She was depressed and anxious. (Id.). She asserted that a drug gang was trying to kill her because she had cleaned up the drug problem on the East Side of Manhattan and was now in the witness protection program. (Id.).

Plaintiff saw Dr. Brewer on November 18, 2010. (Id.). Dr. Brewer's note recounts plaintiff's hospitalization and the medication she received at discharge. (Id.).

Plaintiff's chart indicates that she failed to keep her follow-up appointment with Dr. Brewer on December 3, 2010. (Id. at 440). Plaintiff did see Mr. Sanchez on December 3, 2010. (Id. at 441). She stated that she was afraid of a thief who was attacking women. (Id.). Sanchez was impressed with plaintiff's ability to coherently explain her concerns. (Id.).

Plaintiff saw Mr. Sanchez again on December 13, 2010. (Id.). He reported that Ms. Cordero had improved significantly in the prior two sessions, but noted that her mood was depressed. (Id.).

Plaintiff saw Dr. Brewer for a medication evaluation on December 17, 2010. (Id. at 442). She complained of back pain but was doing better psychologically and reported that she was going to church on Sundays. (Id.). Dr. Brewer adjusted plaintiff's medication. (Id.).

On December 21, 2010, Dr. Brewer completed a Treatment Plan Review for the plaintiff. (Id. at 411). Dr. Brewer's diagnosis was mood disorder not otherwise specified on Axis I, allergic to penicillin and uterus removed due to fibroids on Axis III, occupational and economic problems on Axis IV, and a GAF score of 50 on Axis V. (Id.). Plaintiff reported that her problems with anger were lessening. (Id.). Dr. Brewer's functional Assessment was Mild for the categories: Social/Interpersonal, Money Management, and Leisure (hobbies, interests, etc.), and Moderate for the categories: Health and Educational/Vocational. (Id.).

Plaintiff saw Mr. Sanchez on December 30, 2010. (Id. at 442). She was depressed and tearful, and stated "I'm not feeling well,

23

I'm thinking of going to a hospital to rest." (Id.). She discussed her financial problems and problems with her son. (Id.).

Plaintiff saw Dr. Brewer for a medication evaluation on January 14, 2011. (Id. at 443). She was not eating or sleeping well, and complained about pain all over her body. (Id.). Dr. Brewer increased plaintiff's dose of Abilify. (Id.).

Plaintiff saw Mr. Sanchez on February 3, 2011, and she discussed financial problems and problems with her son. (Id. at 445). She stated that she no longer had aberrant dreams but did suffer from insomnia and anxiety. (Id.).

Plaintiff failed to keep a follow-up medication evaluation appointment with Dr. Brewer on February 8, 2011. (Id. at 447). She saw Dr. Brewer for such an evaluation on February 14, 2011. (Id.). She discussed economic problems and problems with her son. (Id.).

Plaintiff saw Mr. Sanchez on March 2, 2011. (Id. at 448). She discussed her son and improving her self-respect. (Id.).

Plaintiff saw Dr. Brewer on March 11, 2011, for a psychiatric evaluation update. (Id. at 449). Dr. Brewer indicated that she was

24

changing plaintiff's Axis I diagnosis to 295.70 - Schizoaffective
Disorder. (Id.).

   Plaintiff cancelled her appointment with Mr. Sanchez on March
14, 2011, because of a headache, but saw him on March 18, 2011.
(Id. at 450, 453). She reported being afraid to leave her apartment
for fear of being attacked. (Id. at 453). She also discussed her
son's marijuana use. (Id.). Sanchez encouraged plaintiff to
discuss the relationship between marijuana and schizophrenia with
her children. (Id.).

   On March 18, 2011, Dr. Brewer completed a Treatment Plan
Review of plaintiff. (Id. at 411). Her diagnosis was
schizoaffective disorder on Axis I, allergy to penicillin and
uterus removal on Axis III, economic problems on Axis IV, and a
GAF score of 50 on Axis V. (Id.). Plaintiff reported increased
anxiety since the last review and an inability to cook by herself.
(Id.). Dr. Brewer's functional assessment was Mild for the
categories: Social/Interpersonal, Money Management, and Leisure
(hobbies, interests, etc.), and Moderate for the categories:
Health and Educational/Vocational. (Id.).

25

Plaintiff saw Dr. Brewer on April 6, 2011 for a medication evaluation. (Id. at 454). She stated that she was "not doing well", and admitted to taking half of her prescribed Abilify medication because she was "too tired". (Id.). She was concerned about a hearing at housing court because she owed her landlord back rent. (Id.).

Plaintiff saw Mr. Sanchez on April 14, 2011. (Id. at 456). She was sad and depressed, and stated that she wanted to cry but could not. (Id.). Sanchez discussed ways to get plaintiff's son to contribute financially to relieve plaintiff's stress and anxiety about money problems. (Id.).

On May 4, 2011, Dr. Brewer completed plaintiff's Psychiatric Review Technique evaluation. (Id. at 372). The first page of the Review Technique gives an assessment date range of August 21, 2009, until May 3, 2011. (Id.). Also on the first page, Dr. Brewer checked the box for "Impairment(s) Severe and Expected to Last 12 Months or more." (Id.). Given nine categories upon which the diagnosis could be based, Dr. Brewer checked the box for "12.04 Affective Disorders." (Id.).

26

The fourth page of the Review Technique provided three bases for a diagnosis of affective disorder. (Id. at 375). The first was "Depressive syndrome characterized by at least four of the following." (Id.). Dr. Brewer checked this box, as well as five out of the available nine symptoms: "Appetite disturbance with change in weight", "Decreased energy", "Difficulty concentrating or thinking", "Thoughts of suicide", and "Hallucinations, delusions or paranoid thinking." (Id.). The second basis for diagnosis on this page was "Manic syndrome characterized by at least three of the following." (Id.). Dr. Brewer did not check this box, but she did identify two of the listed eight manic symptoms: "Hyperactivity" and "Hallucinations, delusions or paranoid thinking." (Id.). The third basis for diagnosis on this page was "Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes)." (Id.). Dr. Brewer also checked this box. (Id.).

The final section of the Review Technique was a "Rating of Functional Limitations." (Id. at 382). The first page listed the "B" Criteria.[14] (Id.). Dr. Brewer rated plaintiff moderately

---

[14] The RFC assessment considers functional limitations and restrictions that result from an individual's medically

27

impaired for "Restriction of Activities of Daily Living," and markedly impaired for "Difficulties in Maintaining Social Functioning," and "Difficulties in Maintaining Concentration, Persistence, or Pace."[15] (Id.). The fourth category on this page called for the number of "Episodes of Decompensation, Each of Extended Duration," for which Dr. Brewer checked the box for Three. (Id.).

The final page of the Review Technique contained the "C" Criteria.[16] (Id. at 383). Paragraph 1 covered C criteria relating

---

determinable impairment or combination of impairments. The required level of severity for a per se disabling organic mental disorder is met when the requirements in both paragraphs A and B of 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.02 are satisfied, or when the requirements in paragraph C are satisfied. Paragraph B states that a individual's cognitive symptoms -- enumerated in paragraph A -- must result in at least two of the following: (1) marked restriction of activities of daily living; or (2) marked difficulties in maintaining social functioning; or (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration. 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.02(B).

[15] These three Functional Assessment questions give five possible answers: None, Mild, Moderate, Marked, and Extreme.

[16] As stated above, the required level of severity for a per se disabling organic mental disorder is met when the requirements in both paragraphs A and B are satisfied, or when the requirements in paragraph C are satisfied. To be categorized as having an organic mental disorder under paragraph C, an individual must have a "[m]edically documented history of a chronic organic mental disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do

to organic mental, schizophrenic, or affective disorders. (Id.).
Paragraph 2 applied only to anxiety-related disorders and is
crossed out on the sheet. (Id.). For paragraph 1, there are three
possible selections: the first indicates that the patient
satisfies the C criteria and provides three sufficient conditions
for that diagnosis, the second indicates that the evidence does
not establish the presence of C criteria, and the third indicates
that there is insufficient evidence to establish the presence of
C criteria. (Id.). None of these three boxes is checked on the
form. (Id.). However, of the three sufficient conditions listed
under the first heading, the box for "Repeated episodes of
decompensation, each of extended duration" is checked. (Id.). The
other two boxes are not checked. (Id.). The instructions for this
section indicate that it is only to be filled out if the B criteria
are not satisfied. (Id.). Given the partial completion, and the

---

basic work activities, with symptoms or signs currently
attenuated by medication or psychosocial support, and one of the
following: (1) [r]epeated episodes of decompensation, each of
extended duration; or (2) [a] residual disease process that has
resulted in such marginal adjustment that even a minimal
increase in mental demands or change in the environment would be
predicted to cause the individual to decompensate; or (3)
[c]urrent history of 1 or more years' inability to function
outside a highly supportive living arrangement, with an
indication of continued need for such an arrangement." 20 C.F.R.
Pt. 404, Subpt. P, App'x 1 § 12.02(C)(1)-(3).

fact that Dr. Brewer indicated the presence of the B criteria, this section's meaning is ambiguous.

Directly following the Review Technique is a Mental Residual Functional Capacity Assessment, presumably completed by Dr. Brewer. (Id. at 385). The form is undated and unsigned, though its location in the record and content allows the inference that it was completed by Dr. Brewer at the same time as the Review Technique. (Id.).

The Functional Capacity form lists four categories of mental activities to be evaluated for the patient's ability to sustain them for a normal workweek on an ongoing basis. (Id.). The first category is "Understanding and Memory"; the form indicates plaintiff is moderately limited for "[t]he ability to understand and remember very short and simple instructions" and markedly limited for "[t]he ability to remember locations and work-like procedures" and "[t]he ability to understand and remember detailed instructions."[17] (Id.).

_____

[17] The Functional Capacity form gives five possible answers to evaluate the patient's mental capacity: 1. Not Significantly Limited, 2. Moderately Limited, 3. Markedly Limited, 4. No Evidence of Limitation in this Category, and 5. Not Rateable on Available Evidence. (Id. at 385).

The second category is "Sustained Concentration and Persistence"; the form indicates plaintiff is moderately limited for "[t]he ability to carry out very short and simple instructions" and markedly limited in the following categories: "[t]he ability to carry out detailed instructions", "[t]he ability to maintain attention and concentration for extended periods", "[t]he ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances", "[t]he ability to sustain an ordinary routine within special supervision", "[t]he ability to work in coordination with or proximity to others without being distracted by them", "[t]he ability to make simple work-related decisions", and "[t]he ability to complete a normal workday and workweek without interruptions for psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." (Id. at 385-86).

The third category is "Social Interaction", for which the form indicates moderate limitations in "[t]he ability to ask simple questions or request assistance" and "[t]he ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, and markedly limited in "[t]he ability to interact appropriately with the general public", "[t]he ability

31

to accept instructions and respond appropriately to criticism from supervisors", and "[t]he ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes." (Id. at 386).

The fourth category is "Adaptation," and the form indicates that plaintiff is moderately limited in "[t]he ability to be aware of normal hazards and take appropriate precautions," and markedly limited in "[t]he ability to respond appropriately to changes in the work setting", "[t]he ability to travel in unfamiliar places or use public transportation", and "[t]he ability to set realistic goals or make plans independently of others." (Id.).

## 2. **St. Luke's Roosevelt Hospital**

There is scant information in the record regarding plaintiff's admission to St. Luke's Roosevelt Hospital on or about October 4, 2010, save for documentation of a phone call dated October 4, 2010 from Roosevelt Hospital to Dr. Brewer about plaintiff's admission, noting that she had been brought to the emergency room by her family because she was exhibiting bizarre behavior and that she would be admitted to the psychiatric unit. (Id. at 433). There is also a progress note from plaintiff's

32

medication evaluation with Dr. Brewer on October 26, 2010 stating that plaintiff had spent two and a half weeks in the hospital, where she had been diagnosed with schizophrenia - paranoid type. (Id. at 435).

On October 20, 2010, plaintiff was discharged from St. Luke's Roosevelt Hospital. (Id. at 211). The discharge form noted a follow-up appointment for plaintiff at Upper Manhattan Health. (Id.). Plaintiff was given prescriptions of Abilify, Klonopin, and Ambien. (Id.).

### 3. New York Presbyterian Hospital

On November 6, 2010, plaintiff went to the police to request protection from "the mafia." (Id. at 193). Plaintiff was taken to New York Presbyterian Hospital and given a psychiatric consultation by Dr. Alison Hermann. (Id.) During the consultation, plaintiff reported that she was in the witness-protection program because she had cleaned up the drug trade on the lower East Side of Manhattan. (Id.). She also reported that the drug dealers had arranged to send her son to jail, had previously raped her, and were now trying to kill her. (Id.). Plaintiff reported feeling depressed, frequently crying and having difficulty sleeping.

33

(Id.). She denied homicidal/suicidal ideations, but stated that she has schizophrenia. (Id. at 193, 195).

Dr. Hermann described plaintiff as well-groomed, cooperative and pleasant, reported that her speech was fast and pressured, and described her thought process as a flight of ideas.  Dr. Hermann described plaintiff's attention, insight, abstractions and impulse control as poor. (Id.). Dr. Hermann's diagnosis was that plaintiff was suffering from mania and persecutory/paranoid delusions consistent with her history of schizophrenia. (Id.) Plaintiff's GAF score was 35.[18] (Id. at 197). Dr. Hermann proposed to restart plaintiff's medication (Abilify) and reevaluate in the morning. (Id.).

On November 7, 2010, plaintiff was evaluated by Dr. Amighi. (Id. at 178-79). Plaintiff reported starting a new medication a few weeks before, in addition to Abilify. (Id. at 178). She recounted that she had started feeling like a zombie and having other symptoms, so she halved her dose of Abilify one week prior. (Id.). Plaintiff stated that she was stressed because her daughter was about to leave for college. (Id. at 179). She reported that

---

[18] See supra n.6.

34

she felt better after a night of sleep, displayed normal speech patterns and recognized that certain delusions "might be my sickness." (Id. at 178). Dr. Amighi noted that plaintiff's symptoms were consistent with mania and psychosis in the setting of a medication change. (Id. at 179).

On November 8, 2010, plaintiff was discharged from New York Presbyterian Hospital and transferred to Saint Joseph's Medical Center at St. Vincent's Hospital. (Id. at 198-200). At the time of the transfer, plaintiff was calm and cooperative but still suffering from delusions. (Id. at 199). The Discharge report listed plaintiff's GAF score as 30.[19] (Id.).

### 4.   **Saint Joseph's Medical Center**

Plaintiff was hospitalized at Saint Joseph's Medical Center from November 8 to November 16, 2010. (Id. at 210, 224-30). Dr. Cynthia Perry evaluated plaintiff for the Discharge Summary. (Id. at 227). Her diagnosis under the five-axis diagnostic model was Paranoid Schizophrenia and Cocaine Abuse on Axis I, Scoliosis on Axis III, Family/Primary Support, Social/Relationships on Axis IV,

---

[19] See supra n.3.

and a GAF score of 19[20] at time of admission, and none at time of discharge, on Axis V. (Id.). Referring to the admission note, Dr. Perry wrote that plaintiff had a long history of mental illness and "multiple past psychiatric admissions." (Id.).

Plaintiff was given prescriptions for Abilify (15mg), Cogentin (1mg) and Ambien (10mg). (Id. at 229). The discharge plan was for plaintiff to return home and follow up with Dr. Brewer on November 18, 2010. (Id. at 210). Dr. Brewer would then refer plaintiff to a day-treatment program after the next visit. (Id.).

### C. SSA Consultants' Reports

#### 1. Dr. Aurelio Salon

Dr. Aurelia Salon conducted plaintiff's internal medicine examination on November 24, 2010. (Id. at 220-23). Dr. Salon noted

---

[20] A GAF score in the 11-20 range corresponds to "Some danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) OR occasionally fails to maintain minimal personal hygiene (e.g., smears feces) OR gross impairment in communication (e.g., largely incoherent or mute)." See https://www.msu.edu/course/sw/840/stocks/pack/axisv.pdf, last visited May 22, 2014.

that plaintiff had previously been diagnosed with hypertension, though she currently exhibited no symptoms. (Id. at 220). Plaintiff reported suffering intermittent back pain and was diagnosed with scoliosis. (Id.). Dr. Salon noted that plaintiff had had the pterygium of her right eye removed in 1984 and had a total abdominal hysterectomy for fibroids in 2008. (Id.).

According to Dr. Salon, plaintiff did not appear to be in any acute distress, and her gait, stance, skin and lymph nodes, chest and lungs, head and face, eyes, ears, nose, throat, neck, abdomen, and heart all looked and functioned normally. (Id. at 221-22). Plaintiff's spine showed no limitation of motion. (Id. at 222). Her shoulders, hips, and extremities all looked and functioned normally. (Id.).

Dr. Salon diagnosed plaintiff as having a history of paranoid schizophrenia on Axis I, hypertension on Axis II, and a history of back pain and scoliosis on Axis III. (Id. at 223). Plaintiff's prognosis was fair. (Id.). Dr. Salon concluded, "there are no objective findings to support a fact that the claimant would be restricted in her ability to sit or stand, or in her capacity to climb, push, pull, or carry objects." (Id.).

37

### 2. Michael Alexander, Ph.D.

Dr. Michael Alexander, an SSA consultant psychologist from Industrial Medicine Associates, P.C., performed plaintiff's psychological evaluation on November 24, 2010, eight days after her release from St. Joseph's Medical Center. (Id. at 216-19). In his report, he wrote that plaintiff had first been hospitalized for psychiatric reasons in the 1980s, and stated, incorrectly, that her most recent hospitalization was in August 2010. (Id. at 216). From this error we infer that he had no knowledge of Ms. Cordero's more recent hospitalizations at St. Luke's Roosevelt and at St. Joseph's Medical Center.

Dr. Alexander noted that plaintiff was currently taking anti-psychotic medication and seeing a psychiatrist on a monthly basis. (Id.). Dr. Alexander stated, also incorrectly, that there was no family history of mental illness or substance abuse. (Id. at 217).

Plaintiff reported having normal sleep and appetite. (Id. at 216). According to Dr. Alexander, she denied depressive or anxiety-related symptoms and auditory hallucinations. (Id.). Plaintiff claimed that "her paranoia is essentially controlled by medication." (Id. at 217). Plaintiff presented as cooperative,

38

friendly and alert. (Id.). Her appearance, mood, orientation, speech, behavior, coherence, affect, and thought content were all normal and appropriate. (Id.). He reported that plaintiff's attention, concentration, memory, insight, and judgment were good or intact, and that her cognitive functioning was average. (Id.).

Dr. Alexander stated that plaintiff was able to dress, bathe, groom herself, and manage money on her own. (Id.). Plaintiff's son helped her with cooking, cleaning, and shopping. (Id.). She avoided taking public transportation by herself. (Id.). She had friends, enjoyed watching TV, and attended church. (Id.).

Dr. Alexander's diagnosis was no diagnosis on Axis I, paranoid personality disorder on Axis II, and back pain, bladder problems, and vision problems on Axis III. (Id. at 219). He determined plaintiff's prognosis to be fair and recommended continuing her existing psychiatric treatment. (Id.). Dr. Alexander concluded that the "[r]esults of the present evaluation appear to be consistent with longstanding psychiatric problems, which are sufficiently controlled and do not significantly interfere with claimant's ability to function on a daily basis." (Id. at 218).

### 3. **M. Duffy**

On December 2, 2010, SSA Consultant M. Duffy[21] completed a Physical Residual Functional Capacity Assessment of plaintiff's condition. That assessment was apparently based upon a review of her medical records, particularly Dr. Salon's report of his November 24, 2010 examination of plaintiff. (Id. at 249-54).

Assessing plaintiff's exertional limitations, Duffy stated that she could occasionally lift and/or carry fifty pounds and frequently lift and/or carry twenty five pounds with no other limitations on pushing or pulling. (Id. at 250). Duffy estimated that plaintiff could stand and/or walk with normal breaks for a total of about six hours in an eight-hour workday and sit with normal breaks for the same period of time per day. (Id.).

In the initial comments section of the Assessment, Duffy reported that plaintiff was in no acute distress and had completed all function, strength and range-of-motion tests at full function. (Id.). Plaintiff reported a recent diagnosis for hypertension but was not taking any medication. (Id.). Duffy found no postural,

---

[21] It is unclear from the record whether M. Duffy is a physician.

manipulative, visual, communicative, or environmental limitations for the plaintiff. (Id. at 251-52).

Duffy noted that plaintiff complained of back pain that caused difficulty with household chores, which Duffy noted was consistent with plaintiff's medical history. (Id. at 252). Duffy concluded that plaintiff's claimed back restrictions were partially credible based on medical history, but not to the extent alleged. (Id. at 253). Duffy relied on the assertion that plaintiff is independent in personal and most household chores. (Id. at 253). Finally, Duffy noted that his assessment was consistent with -- and presumably based on -- Dr. Salon's report of no physical restriction for plaintiff. (Id.).

### 4. **V. Reddy**

On January 6, 2011, consulting psychologist V. Reddy completed a Psychiatric Review Technique and a Mental Residual Functional Capacity Assessment. It was apparently based upon Reddy's review of at least some of plaintiff's medical records, notably the assessment of SSA consultant Michael Alexander, as Reddy seemingly had never met plaintiff. (Id. at 231-48). On the first page, Reddy checked the box "RFC Assessment Needed" on his

form. (Id. at 231). Reddy based this disposition on the presence
of both an Affective Disorder and Schizophrenic, Paranoid and other
Psychotic Disorders, neither of which "precisely satisfy the
diagnostic criteria" given on the form. (Id. at 231, 233, 234).

Reddy then rated plaintiff's functional limitation in various
categories (the so-called "B" Criteria). (Id. at 241). He reported
that plaintiff had a mild degree of limitation in the following
areas: activities of daily living and maintaining social
functioning. (Id.). He further stated that she had a moderate
degree of limitation in maintaining concentration, persistence, or
pace. (Id.). Finally, Reddy selected the box for "One or Two" under
the assessment of the number of "Repeated Episodes of Deterioration
Each of Extended Duration" category. (Id.).

The next section asked for an assessment of plaintiff's
ability to work (the "C" Criteria). (Id. at 242). Reddy simply
stated that the "[e]vidence does not establish the presence of the
"C" criteria." (Id.).

Next, Reddy completed a Mental Residual Functional Capacity
Assessment. (Id. at 245). This form allowed for a more specific
assessment of plaintiff's limitations and abilities for different

42

mental activities.[22] He determined that in "understanding and memory," plaintiff was not significantly limited, except that plaintiff was moderately limited in "the ability to understand and remember detailed instructions." (Id.). In the area of "sustained concentration and persistence," plaintiff's "ability to carry out detailed instructions" was moderately limited. (Id.). Reddy found that plaintiff was otherwise not significantly limited in this area. (Id. at 245-46).

Reddy similarly found that in the area of "social interaction," plaintiff's "ability to accept instructions and respond appropriately to criticism from supervisors" was moderately limited. (Id. at 246). According to Reddy, plaintiff was otherwise not significantly limited in this area. (Id.).

Reddy found, under the category of "adaptation," that plaintiff's "ability to set realistic goals or make plans independently of others" was moderately limited. (Id.). He

---

[22] This form requires that the claimant's abilities be graded on a five-step scale.  These are: (1) Not Significantly Limited, (2) Moderately Limited, (3) Markedly Limited, (4) No Evidence of Limitation in this Category, and (5) Not Ratable on Available Evidence. (Id. at 245).

indicated that plaintiff was otherwise not significantly limited in this area. (Id.).

Reddy then briefly recounted the findings of Dr. Alexander, and adopted them. (Id. at 247). According to Reddy, "[plaintiff] appears capable of the basic functional requirements of unskilled work in a low stress, low contact environment." (Id.).

## III.  **Testimony Before the ALJ**

### A.  **Plaintiff's Testimony**

Plaintiff appeared before ALJ Solomon on May 10, 2011. (Id. at 10). Represented by an attorney, she testified with the assistance of a Spanish language interpreter.[23] (Id.). Prior to testimony, ALJ Solomon asked plaintiff's counsel whether plaintiff still alleged disability on both exertional and non-exertional bases. (Id. at 13). Mr. Madigan responded that the claim was

---

[23] ALJ Solomon stated "let the record reflect that the claimant did understand what I was asking her in English" after plaintiff answered the ALJ's question without waiting for a translation. (Id. at 18). Later, ALJ Solomon admonished plaintiff that if she chose to testify in Spanish, she had to wait for the interpretation before answering. (Id. at 20).

primarily psychiatric because the IME did not support a finding of physical disability. (Id. at 14).

Plaintiff testified that she had completed some high school in Puerto Rico but had not graduated. (Id.). She stated that she had come to the United States twenty to twenty-five years ago. (Id.). Plaintiff described her English proficiency as "[a] little bit, like medium", but that she spoke with her psychiatrist in Spanish. (Id. at 14-15).

Plaintiff testified that she was not currently working and that she stayed home most of the time. (Id. at 15). She last worked for her landlord helping to rent apartments. (Id.). She stated that she had that job in 2009 and that it had lasted less than a year. (Id. at 16). Plaintiff reported that she had stopped working because her condition had worsened, and she had become paranoid asking people questions. (Id.).

Plaintiff's prior job was as a home health aide. (Id.). She had performed that job for eight to ten years. (Id.). Plaintiff reported that she had stopped working because of depression and because she had difficulty caring for the patients. (Id. at 17).

45

Plaintiff testified that she had a history of cocaine and alcohol use. (Id. at 16). She said that she had stopped using both cocaine and alcohol a year and a half to two years earlier. (Id.). Plaintiff reported that she lived with her two children -- a twenty-five-year-old son and an eighteen-year-old daughter. (Id. at 17). She stated that her son had been incarcerated for about eight months and that his arrest was a triggering event for her hospitalization. (Id. at 19). Plaintiff reported that her son does not work much and is home most of the time. (Id. at 22). Her daughter was in college at St. Thomas Aquinas in upstate New York, but she was currently home for the summer. (Id. at 22-23). In addition to living with her children, plaintiff also rents out a room in her apartment in order to supplement her income. (Id. at 23).

Plaintiff described her fear of going outside alone because she is afraid of being hit by a car. (Id. at 18). She blamed this fear on her medication, but noted her doctor had said that the medication was not the cause. (Id.) Plaintiff testified that her medications make her shaky and affect her vision. (Id. at 21). She stated that her children pick up her medication from the pharmacy, help her to clean, and wash her clothes. (Id. at 18). Plaintiff's

children also do the grocery shopping and prepare meals that plaintiff can warm up. (Id. at 24).

Plaintiff reported an inability to take public transportation by herself. (Id. at 20). She blamed this inability on a fear of terrorists and of being robbed. (Id. at 20-21). At the time of the hearing, she was seeing her psychiatrist, Dr. Brewer, once a month and a therapist once a month. (Id. at 20). She said that her son generally walks with her to those appointments. (Id.). On the day of the hearing, plaintiff travelled by train with a neighbor. (Id.).

Plaintiff testified that she had difficulty leaving her apartment because she feels protected at home. (Id. at 21). She spends most of her time at home doing chores and watching television. (Id. at 22). She stated she did not like to watch the news because she feels scared, and so she generally watches romantic soap operas, but has trouble following the plot. (Id.).

Plaintiff testified that she sleeps about four hours per night, and often stays in bed all day. (Id. at 24). She is scared to take the bus and looks for company when she has to leave the

47

house. (Id. at 25). She is sad most of the time and cries a lot. (Id.).

Plaintiff recounted that sometimes "bad thoughts" of suicide come into her mind but that she does not have the strength to follow through. (Id.). She stated that she did not feel well while on her medication and sometimes stops taking it to feel better. (Id.). When noncompliant with medication, plaintiff experiences hallucinations and delusions. (Id. at 26). Plaintiff testified that she has lost weight since she stopped working and has a poor appetite. (Id. at 26). She often experiences anger when feeling sick. (Id.).

Plaintiff agreed with the ALJ's statement that she was depressed over both her finances and the situation with her children, but added that she is also depressed over bad things that are happening in the world. (Id. at 27). Plaintiff finished by saying that she considered going to a nursing home but her children will not let her. (Id.). She feels more secure in a hospital than at home because the nurses take care of her. (Id.).

48

**B. Vocational Expert Testimony**

Melissa Fass-Karlin testified as a vocational expert witness. (Id.). Fass-Karlin testified she did not know plaintiff professionally or personally. (Id. at 28). She had listened to plaintiff's testimony and reviewed the evidentiary record prior to testifying. (Id.).

Fass-Karlin described plaintiff's past work as: "home attendant which is medium semi-skilled work with an SVP: 3. And she worked as a real estate agent which is light skilled work with an SVP: 8." (Id.).

ALJ Solomon then began suggesting a number of hypothetical factual findings and asking Fass-Karlin questions about that hypothetical person's ability to work. (Id.). First, the ALJ proposed:

> There are no exertional limitations; and the Claimant can remember, understand, and carry out simple instructions; can make simple work-related decisions; can maintain a regular schedule; can maintain attention and concentration for an extended two-hour period[], and can perform jobs at a low-stress environment with only occasional interpersonal contact.

49

(Id.). Fass-Karlin testified that the plaintiff would not be able to perform any of her past relevant work under those assumptions. (Id.). She testified, however, that under the same assumptions plaintiff could perform three jobs: hand packager, cleaner, and assembler of small products. (Id. at 29).

She testified that the job of Hand packager is medium unskilled work, SVP: 2, and that there are 10,318 local jobs and 162,882 in the national economy. (Id.). She stated that the job of Cleaner is medium unskilled work, SVP: 2, and that there are 79,178 such jobs in local economy and 1,058,365 jobs in the national economy. (Id.). Fass-Karlin testified that the job of Assembler of small products is light unskilled work, SVP: 2, and that there are 1,073 such jobs in local economy and 40,662 in national economy. (Id.).

Next, ALJ Solomon asked Fass-Karlin to assess plaintiff's ability to work if the ALJ accepted the findings of plaintiff's treating physician, with significant marked restrictions in all areas. (Id.). Fass-Karlin testified that there would be no work that plaintiff could perform in that condition. (Id.).

## IV. The ALJ's Decision

ALJ Solomon issued his decision denying plaintiff's claim on July 15, 2011. (Id. at 33-45). He noted, as a threshold matter, that plaintiff had "acquired sufficient quarters of coverage to remain insured through December 31, 2014". (Id. at 36).

The ALJ then engaged in the required five-step sequential analysis. See 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920; Williams ex rel. Williams v. Bowen, 859 F.2d 255, 259 (2d Cir. 1988). At step one he determined that plaintiff had not engaged in substantial gainful activity since the alleged onset date of June 19, 2010. (Id. at 38). At step two, the ALJ found that plaintiff had severe impairments, as defined by 20 CFR 404.1520(c) and 416.920(c): mood disorder, schizoaffective disorder, and a history of substance abuse disorder. (Id.). The ALJ found no severe physical impairments, citing the findings of M. Duffy. (Id.)

At step three, the ALJ found that plaintiff did not have an "impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. § 404, Subpart

51

P, Appendix 1." (Id. at 39). In order to satisfy the paragraph B[24] criteria, plaintiff's impairment must encompass at least two of the following four conditions: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration. 20 C.F.R. § 404, Subpart P, App. 1, §§ 12.04, 12.08. ALJ Solomon found that plaintiff had mild restrictions in daily living, stating that she "can care for her personal needs, attend medical appointments, do household chores, and food shopping." (Tr. 39). In so finding, he cited plaintiff's testimony and the report of Dr. Alexander. (Id.).

The ALJ determined that plaintiff had moderate restriction in social functioning, but noted that "mental status exams show her as friendly, cooperative and alert." (Id.). In support of this determination, the ALJ cited Dr. Alexander's report and medical records from New York Presbyterian Hospital. (Id. (citing id. at 178-79, 193-200)). Of particular importance to the ALJ was Dr. Alexander's description of plaintiff attending church and interacting with friends. (Id. (citing id. at 217)).

---

[24] See n.16, supra.

The ALJ also determined that plaintiff had moderate difficulties with respect to concentration, persistence, and pace. (Id.). ALJ Solomon cited Dr. Alexander's report and the cognitive-functioning and intelligence examination conducted at St. Joseph's Medical Center on November 16, 2010. (Id. (citing id. at 210, 216-19, 224-30)).

Finally, the ALJ determined that plaintiff had had no episodes of decompensation of extended duration. (Id.). Thus, the ALJ concluded that plaintiff's impairments did not satisfy any of the four paragraph B conditions. (Id.).

The ALJ then found that "the evidence fail[ed] to establish the presence of paragraph C criteria." (Id.).[25] Since the ALJ found that plaintiff's impairments satisfied neither the paragraph B nor the paragraph C requirements, he determined that plaintiff did not have an impairment or combination of impairments that met the Appendix 1 criteria. (Id.).

Before proceeding to step four of the sequential process, the ALJ assessed plaintiff's residual functional capacity. (Id. at

---

[25] See n.15, supra.

40). He concluded that plaintiff had the RFC "to perform a full range of work at all exertional levels" with the non-exertional limitation that she "can remember, understand, and carry out simple instructions, make simple work-related decisions, can maintain a regular schedule, can maintain attention and concentration for extended two hour segments, and perform work in a low stress environment with only occasional interpersonal contact." (Id.).

The ALJ noted Dr. Brewer's assessment, which found that plaintiff has moderate restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; and three episodes of decompensation. (Id. at 42). However, the ALJ gave Dr. Brewer's assessment "little weight" in light of the overall record. (Id. at 43). He cited two reasons for discounting Dr. Brewer's findings. One stemmed from the disparity between Dr. Brewer's records for the assessment period, purportedly indicating that plaintiff was only mildly or moderately limited, and the doctor's later assessment covering this period indicating marked limitations. (Id. at 43). As for the other, the ALJ stated that while Dr. Brewer's assessment indicated that plaintiff was unable to work from August 2009 until May 2011, plaintiff was actually working "at substantial gainful levels" for part of that period.

The ALJ thus found that Dr. Brewer was unable to accurately determine plaintiff's ability to work for at least part of this time. (Id.).

ALJ Solomon then found plaintiff's own account of her condition to be "not fully credible", and stated that even though he did not "infer that the claimant is without symptoms or functional imitations . . . the record as a whole supports a conclusion that the claimant is able to perform simple work activities as outlined in the residual functional capacity assessment." (Id.). The ALJ gave substantial weight in this respect to Dr. Alexander's assessment and, to a lesser extent, the assessment of Reddy. (Id.).

At step four, the ALJ determined that plaintiff was unable to perform any of her past relevant work. (Id.).

At the fifth step of the analysis, the ALJ utilized the Medical-Vocational Guidelines ("the Grids"). In doing so, he noted that plaintiff qualified as a younger individual because she was forty-nine years old as of the onset date of her asserted disability. (Id.). Next, the ALJ found that plaintiff had limited education but was able to communicate in English. (Id.). The ALJ

55

nonetheless noted that the Grids provide only a framework for decision-making when the claimant suffers from non-exertional limitations. (Id. at 44).

The ALJ found that there are jobs that exist in significant numbers in the national economy that the plaintiff could perform. (Id. at 44). He relied on the testimony of vocational expert Fass-Karlin in making this finding, and adopted Fass-Karlin's findings that plaintiff could perform the jobs of Hand Packager, Cleaner, and Assembler of Small Products, and that each of these jobs was available in the national economy. (Id.). The ALJ concluded that plaintiff was not disabled, as defined by the Act, and therefore was not entitled to benefits. (Id.).

## ANALYSIS

### I. Standard for Benefits Eligibility

In order to qualify for disability insurance benefits, an applicant claiming disability must "demonstrate that she was disabled as of the date on which she was last insured." Behling v. Comm'r of Soc. Sec., 369 F. App'x 292, 294 (2d Cir. 2010) (citing 42 U.S.C. § 423(a)(1)(A)). To qualify for SSI benefits, an

applicant must demonstrate disability and meet the resource and income limits established by the Act. Mesias v. Doe, 2012 WL 3704824, at *3 (E.D.N.Y. 2012); see 20 C.F.R. § 416.202. The SSA determines applicants' eligibility for SSI benefits on a month-to-month basis. See 20 C.F.R. § 416.203. For purposes of eligibility for either disability or SSI benefits, an applicant is "disabled" within the meaning of the Act if she is unable "'to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months.'"[26] Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 641-42 (2d Cir. 1983) (quoting 42 U.S.C. § 423(d)(1)(A)).

The Act requires that the relevant physical or mental impairment be "'of such severity that [plaintiff] is not only unable to do h[er] previous work but cannot, considering h[er] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.'" Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004) (quoting 42

---

[26] "Substantial gainful activity" is defined as work that "[i]nvolves doing significant and productive physical or mental duties" and "[i]s done (or intended) for pay or profit." 20 C.F.R. § 404.1510; see, e.g., Craven v. Apfel, 58 F. Supp.2d 172, 183 (S.D.N.Y. 1999); Pickering v. Chater, 951 F. Supp. 418, 424 (S.D.N.Y. 1996).

U.S.C. § 423(d)(2)(A)). If the plaintiff can perform substantial gainful work existing in the national economy, it is immaterial, for purposes of the Act, that an opening for such work may not be found in the immediate area where she lives or that a specific job vacancy may not exist. 42 U.S.C. § 423(d)(2)(A). The same criteria apply to applications for SSI benefits. See, e.g., Reyes v. Barnhart, 2004 WL 439495, at *4 (S.D.N.Y. Mar. 9, 2004); Rodriguez v. Barnhart, 2002 WL 31307167, at *5 (S.D.N.Y. Oct. 15, 2002).

In assessing a claim of disability, the Commissioner must consider: "(1) objective medical facts; (2) diagnosis or medical opinions based on those facts; (3) subjective evidence of pain and disability testified to by claimant and other witnesses; and (4) the claimant's background, age, and experience." Williams, 859 F.2d at 259. As noted, the SSA regulations set forth a five-step sequential process under which an ALJ must evaluate disability claims. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920. The Second Circuit has described this sequential process as follows:

> First, the Secretary considers whether the claimant is currently engaged in substantial gainful activity. If [s]he is not, the Secretary next considers whether the claimant has a "severe impairment" which significantly limits [her] physical or mental ability to do basic work activities. If the claimant suffers

58

such an impairment, the third inquiry is
whether, based solely on medical evidence, the
claimant has an impairment which is listed in
Appendix 1 of the regulations. If the claimant
has such an impairment, the Secretary will
consider h[er] disabled without considering
vocational factors such as age, education, and
work experience; the Secretary presumes that
a claimant who is afflicted with a "listed"
impairment is unable to perform substantial
gainful activity. Assuming the claimant does
not have a listed impairment, the fourth
inquiry is whether, despite the claimant's
severe impairment, [s]he has the residual
functional capacity to perform h[er] past
work. Finally, if the claimant is unable to
perform h[er] past work, the Secretary then
determines whether there is other work which
the claimant could perform.

Bush v. Shalala, 94 F.3d 40, 44-45 (2d Cir. 1996) (emphasis in

original) (quoting Rivera v. Schweiker, 717 F.2d 719, 722-23 (2d

Cir. 1983)).

    To determine whether the claimant has one of the Appendix 1

"listed" impairments referred to in the third step of the

sequential process, the ALJ must consult the relevant criteria for

each listing. With respect to mental disorders, the pertinent

listing criteria are found in Paragraph C of 20 C.F.R. § 404.1545.

"The criteria in paragraph A substantiate medically the presence

of a particular mental disorder" while "[t]he criteria in

paragraphs B and C describe impairment-related functional

limitations that are incompatible with the ability to do any gainful activity." 20 C.F.R. § 404, Subpart P, App. 1, § 12(A). The claimant has a listed disorder "if the diagnostic description in the introductory paragraph and the criteria of both paragraphs A and B (or A and C, when appropriate) of the listed impairment are satisfied." Id.

If the claimant does not have a listed impairment, before proceeding to the fourth step of the sequential process the Commissioner must determine claimant's RFC, which is her ability to do physical and mental work activities on a sustained basis, despite limitations from her impairments. See, e.g., Bush, 94 F.3d at 45. Put another way, the claimant's RFC is her maximum remaining ability, despite her limitations, "'to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis.'" Schultz v. Astrue, 2008 WL 728925, at *6 (N.D.N.Y. Mar. 18, 2008) (quoting Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999)). If a claimant has more than one impairment, all medically determinable impairments must be considered, including those that are not "severe." The assessment must be based on all relevant medical and other evidence, such as physical abilities, mental abilities, and symptomology, including

60

pain and other limitations that could interfere with work activities on a regular and continuing basis. 20 C.F.R. § 404.1545(a)(1)-(3).

Plaintiff bears the burden of proof on the first four steps, but the Commissioner bears the burden on the fifth step, that is, demonstrating the existence of jobs in the economy that plaintiff can perform. See, e.g., Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009).

## II. **Standard of Review**

When a claimant challenges the SSA's denial of disability insurance or SSI benefits, the court may set aside the Commissioner's decision only if it is not supported by substantial evidence or was based on legal error. Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998) (citing Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam)); see also 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive"). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support

a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971)

(quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938));

see also Matthews v. Leavitt, 452 F.3d 145, 152 n.9 (2d Cir. 2006);

Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004). The

substantial-evidence test applies not only to the Commissioner's

factual findings, but also to inferences to be drawn from the

facts. See, e.g., Carballo ex rel. Cortes v. Apfel, 34 F. Supp.2d

208, 214 (S.D.N.Y. 1999). In determining whether the record

contains substantial evidence to support a denial of benefits, the

reviewing court must consider the whole record, weighing the

evidence on both sides of the question. See, e.g., Brown v. Apfel,

174 F.3d 59, 62 (2d Cir. 1999); Williams, 859 F.2d at 258.


It is the duty of the Commissioner, not the courts, to resolve

evidentiary conflicts and to appraise the credibility of

witnesses, including the claimant. See Veino v. Barnhart, 312 F.3d

578, 588 (2d Cir. 2002); Clark v. Comm'r of Soc. Sec., 143 F.3d

115, 118 (2d Cir. 1998). Nonetheless, while the ALJ need not

resolve every conflict in the record, Miles v. Harris, 645 F.2d

122, 124 (2d Cir. 1981), "the crucial factors in any determination

must be set forth with sufficient specificity to enable [a

reviewing court] to decide whether the determination is supported

by substantial evidence." Ferraris v. Heckler, 728 F.2d 582, 587

(2d Cir. 1984).

In addition to the sufficiency of the evidence in the record, a reviewing court must consider the ALJ's application of the law to the record before him. Even if the record, as it stands, contains substantial evidence of disability, the SSA decision may not withstand challenge if the ALJ committed legal error. Balsamo, 142 F.3d at 79. Of particular importance, as disability benefits proceedings are non-adversarial in nature, the ALJ has an affirmative obligation to fully develop the administrative record, even when a claimant is represented by counsel. Lamay v. Comm'r of Soc. Sec., 562 F.3d 503, 508-09 (2d Cir. 2009) (citing Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999) (internal quotation marks omitted)); see also Butts, 388 F.3d at 386. To this end, the ALJ must make every reasonable effort to help an applicant procure medical reports from her medical sources. 20 C.F.R. §§ 404.1512(d), 416.912(d).

More specifically, "[t]he record as a whole must be complete and detailed enough to allow the ALJ to determine claimant's residual functional capacity." Casino Ortiz v. Astrue, 2007 WL 2745704, at *7 (S.D.N.Y. Sept. 21, 2007) (citing 20 C.F.R. § 404.1513(e)(1)-(3)). The ALJ must therefore seek additional

evidence or clarification when the "report from claimant's medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or [it] does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." Bonet v. Astrue, 2008 WL 4058705, at *18 (S.D.N.Y. Aug. 22, 2008) (brackets omitted).[27]

The ALJ must also adequately explain his reasoning in making the findings on which his ultimate decision rests, and in doing so he must address all pertinent evidence. See, e.g., Diaz v. Shalala, 59 F.3d 307, 315 (2d Cir. 1995); Pacheco v. Barnhart, 2004 WL 1345030, at *4 (E.D.N.Y. June 14, 2004) ("It is self-evident that a determination by the [ALJ] must contain a sufficient explanation of [his] reasoning to permit the reviewing court to judge the adequacy of [his] conclusions."). Courts in this Circuit have long

---

[27] The version of 20 C.F.R. § 404.1512(e) that was in effect when the ALJ rendered his decision and when the Appeals Counsel denied review required that the Commissioner seek clarification from a medical source if the evidence received from that source is inadequate to determine disability. In 2012, that requirement was modified and the amended regulations now afford the ALJ greater discretion over when to seek clarifying information. How We Collect and Consider Evidence of Disability, 77 Fed. Reg. 10651-01 (Feb. 23, 2012). We apply the version of the regulations that was in effect at the time of the agency's final decision, see Lowry v. Astrue, 474 F. App'x 801, 804 n.2 (2d Cir. 2012); Barry v. Colvin, 2014 WL 1219191, *3 n.4 (W.D.N.Y. Mar. 24, 2014), which in this case was the regulation in effect prior to the 2012 amendment.

held that an ALJ's "failure to acknowledge relevant evidence or to explain its implicit rejection is plain error." Pagan v. Chater, 923 F. Supp. 547, 556 (S.D.N.Y. 1996).

As for available remedies, the Act authorizes a court, when reviewing decisions of the SSA, to order further proceedings. See 42 U.S.C. § 405(g) ("The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."). If there are gaps in the administrative record or the ALJ has applied an improper legal standard, the court will remand the case for further development of the evidence or for supplemental findings. Rosa v. Callahan, 168 F.3d 72, 82-83 (2d Cir. 1999). Remand is particularly appropriate where further findings or explanation will clarify the rationale for the ALJ's decision. Pratts, 94 F.3d at 39. If, however, the reviewing court concludes that an ALJ's determination was not supported by substantial evidence, a remand solely for calculation of benefits may be appropriate. See, e.g., Butts, 388 F.3d at 386.

65

## III. **Evaluation of the ALJ's Decision**

At the outset of our evaluation, we note that plaintiff, who is proceeding pro se, failed to submit a response to defendant's motion for judgment on the pleadings. Because plaintiff's representative and ALJ Solomon focused primarily on plaintiff's non-exertional impairments, our evaluation also focuses on plaintiff's mental condition.

For the reasons set forth below, we recommend that defendant's motion for judgment on the pleadings be denied, and that plaintiff's case be remanded for further administrative review.

### A. **The ALJ's Failure to Fully Develop the Administrative Record**

When reviewing a decision denying benefits to a plaintiff, "we must first satisfy ourselves that the claimant has had 'a full hearing under the Secretary's regulations and in accordance with the beneficent purposes of the Act.'" Echevarria v. Sec'y of Health and Human Servs., 685 F.2d 751, 755 (2d Cir. 1982) (quoting Gold v. Sec'y of Health, Educ. and Welfare, 463 F.2d 38, 43 (2d Cir. 1972)). The SSA regulations mandate that it is the ALJ's

responsibility to develop plaintiff's "complete medical history for at least the 12 months preceding the month in which" plaintiff filed an application for benefits. 20 C.F.R. § 404.1512(d). Additionally, the SSA regulations require the ALJ to delve into the "complete medical history for the 12-month period prior to the month" plaintiff was last insured for benefits. 20 C.F.R. § 404.1512(d)(2); see also Pino v. Astrue, 2010 WL 5904110, at *18 (S.D.N.Y. Feb. 8, 2010).

The record reflects several gaps in potentially significant information that the ALJ failed to fill. Two in particular are notable.

First, as noted, plaintiff was hospitalized at St. Luke's Roosevelt in October 2010 for more than two weeks for psychiatric observation and treatment, a stay that preceded by less than a month an equally long stay at New York Presbyterian and St. Joseph's Medical Center (St. Vincent's Hospital). (Tr. 156, 178, 210, 224-30, 433). Although the details of that October hospitalization -- occurring only a few months after plaintiff's asserted onset of disability -- are obviously significant for an assessment of her disability claim, the record contains almost no documentation of the findings and treatment by the staff of St.

67

Luke's Roosevelt -- the only exception being the unenlightening discharge sheet, which simply lists her medications. (Id. at 156).[28] In the ALJ's decision, he makes only passing reference to this and other hospitalizations of plaintiff during the relevant period -- in itself a serious omission that we discuss below -- but the failure to procure the relevant records of the October confinement plainly precluded a meaningful assessment of its impact on the weight of the evidence supporting a finding of psychiatric disability.

Second, apart from that glaring omission, we note that in making the determination that plaintiff was not disabled, ALJ Solomon gave substantial weight to the findings of the consultant psychologist and the non-examining consultant, and gave the findings of Dr. Brewer, the treating psychiatrist, "little weight." (Tr. 43). In giving Dr. Brewer's assessment "little weight", the ALJ relied primarily on the purported "fact" that plaintiff had worked at "substantial gainful levels" until January 2010, which the ALJ believed must signify that Dr. Brewer was "not fully apprised" of plaintiff's ability to work during at least

---

[28] As noted, the record also has a memo from the Upper Manhattan Health Center recounting a telephone call from a doctor at St. Luke's Roosevelt reporting plaintiff's arrival at the emergency room due to bizarre behavior on her part. (Id. at 433).

part of the relevant time period. (Id.). The ALJ's assertion that plaintiff had engaged in such substantial work presumably comes from plaintiff's own testimony at the hearing, in which she stated, in brief and unenlightening terms, that in or about 2009 -- though she was unsure of the dates -- she assisted her landlord in some unspecified way in renting apartments for an unspecified period that was less than a year. (Id. at 15-16). At that point in the hearing transcript, a colloquy occurred between the vocational expert, Melissa Fass-Karlen, and the ALJ, in which Ms. Fass-Karlen seemed to characterize the work described by plaintiff as that of a "real estate agent." (Id. at 15). Plaintiff then explained that she had stopped assisting her landlord because she had been getting sicker, she did not like to leave her home, and she got paranoid asking people questions. (Id. at 16).


As noted, the ALJ is obligated to develop the record and to fill in any gaps in evidence that may be significant for his assessment of the plaintiff's condition and limitations. See Bonet, 2008 WL 4058705, at *18. The ALJ failed to do so here. Thus, he did not inquire, either directly from plaintiff during the hearing, or at any point after from her treating psychiatrist, regarding the pertinent details of plaintiff's 2009 work and how that would affect the doctor's estimate of his patient's capacity

for work. ALJ Solomon did not ask how many hours per day or per week plaintiff had engaged in such work, nor did he seek to clarify for how long she had engaged in this effort, or ask her what physical activities (including leaving her building) this assistance entailed. Therefore, he would have been unable to determine whether or not it constituted "substantial gainful employment" under the SSA regulations.[29] Additionally, from the way in which plaintiff very briefly described the work during the hearing, it appears that she was assisting her landlord in showing apartments in her own building, thus indicating that this work did not require her to leave her building. This is an important distinction, as one of the main issues in this case is whether plaintiff is well enough to travel in public to reach a worksite and perform work. Further, plaintiff testified that she had to stop doing this work in any capacity because of her symptoms of depression and paranoia. (Tr. 16). Her inability to perform even a small amount of work that did not involve leaving her own apartment building speaks directly to the severity of her illness and her functional limitations. Thus, the ALJ's failure to seek out more information regarding her 2009 work history -- and his

---

[29] See 20 C.F.R. § 404.1510.

reliance on his unsupported assumption about it to reject the treating doctor's findings -- was error and necessitates remand.

Further, because the duration of plaintiff's work for her landlord is unclear from the record, it is impossible to determine whether this employment could qualify as an "unsuccessful work attempt" under SSR 84-25 or a "trial work period" under 20 C.F.R. 404.1592. The unsuccessful-work-attempt concept was "designed as an equitable means of disregarding relatively brief work attempts that do not demonstrate sustained substantial gainful activity." SSR 84-25. The regulations state that the SSA will generally consider work that a claimant is forced to stop after a short time because of her impairment as an unsuccessful work attempt, and her earnings from that work will not show that she is able to do substantial gainful activity. Id.

In order for a period of employment to be considered an unsuccessful work attempt, there must first be a significant break in the continuity of the claimant's work because of the impairment. Where the work period is less than three months, it will be considered an unsuccessful work attempt if the claimant stopped working because of the impairment or removal of special conditions that had permitted her to work. 20 C.F.R. § 4041574(c)(2)-(3). If

the work period is between three and six months, it will be considered an unsuccessful work attempt if it ended because the special condition was impaired or removed and either (i) the claimant was frequently absent because of the impairment; (ii) the claimant's work was unsatisfactory because of the impairment; (iii) the claimant worked during a period of temporary remission of her impairment or (iv) the claimant worked under special conditions that were essential to her performance and these conditions were removed. Id. at § 404.1574(c)(4).[30]

Here, the number of months plaintiff spent working for her landlord is unclear, as is the frequency of the work, hours spent, and the circumstances in which she provided services. However, there is evidence in the record that she was forced to stop that work due to escalating symptoms of her mental disorder. (See Tr. 15-16 (plaintiff testified that she stopped working because she was getting "more sick" and felt paranoid)). It was the duty of the ALJ to confirm the duration and other details of plaintiff's

---

[30] A claimant who is disabled may also test her ability to work by performing services for up to nine months, called a "trial work period." 20 C.F.R. § 404.1592(a). Services performed by a claimant during the nine-month period are not deemed to show that a claimant's disability has ended until the claimant has performed service for at least nine months. Id.

72

work, in order to determine whether she was engaged in substantial gainful activity. Because the ALJ failed to seek out this information, remand is necessary.[31]

### B. The ALJ's Failure Properly to Apply the Treating Physician Rule

#### 1. The Treating Physician Rule

The SSA regulations specify that "the opinion of a claimant's treating physician as to the nature and severity of the claimant's impairments is given 'controlling weight' so long as it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003) (quoting 20 C.F.R. § 404.1527(d)(2)).

Although the treating-physician rule generally requires deference to the medical opinion of a plaintiff's treating physician, see Schisler v. Sullivan, 3 F.3d 563, 567-68 (2d Cir.

---

[31] We note also that the ALJ's decision appears to omit the records of plaintiff's treatment by Dr. Brewer in 2009. See n.7, supra. This omission too should be corrected.

73

1993), the treating physician's findings need not be given controlling weight if they are inconsistent with other substantial evidence in the record, including, when appropriate, the opinions of other medical experts. Burgess, 537 F.3d at 128; 20 C.F.R. § 404.1527(d)(2). Indeed, the opinions of non-examining sources may override treating sources' opinions and be given significant weight, so long as they are supported by sufficient medical evidence in the record. See, e.g., Diaz v. Shalala, 59 F.3d 307, 313 n.5 (2d Cir. 1995). The findings of such consulting doctors are to be treated as opinion evidence pertinent to the nature and severity of the claimant's medical condition. 20 C.F.R. § 416.927(f)(2)(i).

However, "not all expert opinions rise to the level of evidence that is sufficiently substantial to undermine the opinion of the treating physician." Burgess, 537 F.3d at 128. This category includes a consultant's opinion rendered "in terms 'so vague as to make it useless in evaluating' the claimant's [condition]." Id. at 129 (quoting Curry v. Apfel, 209 F.3d 117, 123 (2d Cir. 2000)). Similarly, the opinions of consulting physicians, whether examining or non-examining, are entitled to relatively little weight where there is strong evidence of disability in the record, Simmons v. U.S. R.R. Ret. Bd., 982 F.2d 49, 56 (2d Cir. 1992), or

74

in cases in which the consultant did not have a complete record before him. E.g., Pratts v. Chater, 94 F.3d 34, 38 (2d Cir. 1996)(citing cases).

Even if the treating physician's opinion conflicts with other medical evidence that might be considered "substantial," the ALJ must still consider various factors to determine how much weight, if any, to give that doctor's opinion. Among those considerations are: "the [l]ength of the treatment relationship and the frequency of examination; the [n]ature and extent of the treatment relationship; the relevant evidence . . ., particularly medical signs and laboratory findings supporting the opinion; the consistency of the opinion with the record as a whole; and whether the physician is a specialist in the area covering the particular medical issues." Burgess, 537 F.3d at 129 (quoting C.F.R. §§ 404.1527(d)(2)(i)-(ii), (3)-(5)). An ALJ must not substitute her "own assessment of the relative merits of the objective evidence and subjective complaints for that of a treating physician." Garcia v. Barnhart, 2003 WL 68040, at *7 (S.D.N.Y. Jan. 7, 2003).

Consistent with the ALJ's general duty to fully develop the record, the regulations specify that before rejecting or discounting the treating doctor's findings, the ALJ must re-

contact the claimant's treating physician or psychologist if his or her report "contains a conflict or ambiguity that must be resolved." 20 C.F.R. § 404.1512(e); Clark v. Commissioner of Social Security, 143 F.3d 115, 117 (2d Cir. 1998).[32]

## 2. The ALJ's Misapplication of the Treating Physician Rule

Although ALJ Solomon acknowledged that a treating source is "normally entitled to significant weight as per Social Security Ruling 96-2p", he nevertheless gave "Dr. Brewer's limitations [sic.] little weight in light of the overall record." (Tr. 43). ALJ Solomon stated that Dr. Brewer's opinion was contradicted by other evidence in the record, citing Dr. Brewer's assessment of plaintiff's limitations as "marked" when "throughout treatment notes, her condition is indicated as resulting in mild to moderate limitations". (Id.). However, even a cursory review of the record shows multiple instances where medical personnel -- including Dr. Brewer -- described plaintiff's symptoms as severe or marked. (See, e.g., id. at 166, 183, 275, 424, 439 (describing symptoms of delusion); id. at 166, 423, 424, 439 (describing symptoms of paranoia); id. at 421, 424, 425, 429 (describing symptoms of

---

[32] See n.27, supra.

anxiety); id. at 421 (describing threat to harm herself); id. at
197 (giving plaintiff a GAF score of 35); id. at 199 (giving
plaintiff a GAF score of 30); id. at 227 (giving plaintiff a GAF
score of 19)). Moreover, as noted, plaintiff was repeatedly
hospitalized in various marked conditions of psychiatric
dysfunction, a fact that the ALJ vaguely alludes to but never
explicitly confronts. Further, if the ALJ believed that Dr.
Brewer's May 4, 2011 psychiatric review conflicted with his
previous treatment notes, it was his duty to re-contact Dr. Brewer
and inquire as to this discrepancy, see Clark, 143 F.3d at 117,[33]
and yet he failed to do so.

---

[33] We note that in adopting the 2012 amended version of 20 C.F.R.
§ 404.1512(e) after a notice-and-comment period, the SSA stated
"there are times when we would still expect adjudicators to
recontact a person's medical source first; that is, when
recontact is the most effective and efficient way to obtain the
information needed to resolve the inconsistency or insufficiency
in thee evidence received from that source . . . In fact, we
expect that adjudicators will often contact a person's medical
source(s) first whenever the additional information sought
pertains to findings, treatment, and functional capacity,
because the treating source may be the best source regarding
these issues." How We Collect and Consider Evidence of
Disability, 77 Fed. Reg. 10651-01 (Feb. 23, 2012). In this case,
it is apparent that the most efficient and effective way of
obtaining clarification about the perceived inconsistencies in
Dr. Brewer's records would be to recontact her directly. Cf.
Rolon v. Comm'r of Soc. Sec., 2014 WL 241305, at *7 (S.D.N.Y.
Jan. 22, 2014); Jimenez v. Astrue, 2013 WL 4400533, at *11
(S.D.N.Y. Aug. 14, 2013).

Even if the ALJ permissibly chose not to fully credit Dr. Brewer's assessment, he was required to examine the factors enumerated in C.F.R. §§ 404.1527(d)(2) in determining the weight to give the treating physician's opinion. The ALJ's report does not discuss these factors, and instead offers a cursory statement that he gave "more substantial weight to the opinion of the CE based on his exam and expertise." (Tr. 43). This casual explanation of the ALJ's rejection of the treating psychiatrist's findings is patently inadequate.

Moreover, the ALJ's statement that the consultant's report is "in agreement with the majority of the medical evidence" is not supported by the record. Indeed, the record shows that Dr. Alexander's report contains multiple material errors. First, Dr. Alexander stated in his report that plaintiff had no family history of mental illness (id. at 217), but she had earlier reported that her father had been schizophrenic and that her grandmother had committed suicide. (Id. at 160). Second, Dr. Alexander stated that plaintiff's most recent hospitalization was in August 2010 (id. at 216), but the record shows that plaintiff was hospitalized three times between August 2010 and her November 24, 2010 examination with Dr. Alexander, with one of those hospitalizations lasting

eight days and another lasting more than two weeks. (See id. at
178-79, 193-97, 210-11, 224-30). In fact, plaintiff was discharged
from Saint Joseph's Medical Center only eight days before her
examination by Dr. Alexander. (Id. at 224-30). Even if Dr.
Alexander did not have access to these records, ALJ Solomon
certainly did, and yet he did not acknowledge these discrepancies
in Dr. Alexander's report, much less take them into explicit
account in relying on Dr. Alexander's opinions. This failure
necessitates remand. See, e.g., Gunter v. Commissioner of Soc.
Sec., 361 F. App'x 197, 200 (2d Cir. 2010) (citing Hidalgo v.
Bowen, 822 F.2d 294, 298 (2d Cir. 1987) (holding that
Commissioner's evidence was not sufficiently substantial to
override the treating physician's assessment of the plaintiff's
abilities, where consulting doctor did not review the complete
medical records of the plaintiff).


ALJ Solomon also emphasized the purported fact that plaintiff
was working "at substantial gainful levels" until January 2010,
and he opined that because Dr. Brewer did not mention this asserted
activity, "Dr. Brewer was not fully apprised of her ability to
work during at least part of the original period claimed and during
the beginning of treatment." (Id.). As we previously noted, the

ALJ did not adequately develop the record regarding the nature and extent of plaintiff's 2009 work, and therefore his assertion that plaintiff was engaging in substantial work activity, as well as his determination that Dr. Brewer's assessment is contradicted by plaintiff's 2009 work -- and thus entitled to little weight -- are not adequately supported by the record.

The ALJ's decision to give Dr. Brewer's assessment little weight is based on unsupported assumptions and facts not in the record, as well as unexplained reasoning and indefensible reliance on a factually misguided report by a consultant, and is therefore erroneous. In sum, the ALJ failed to give the opinion of plaintiff's treating physician an adequate assessment, and this necessitates remand.

### C. **The ALJ's Failure to Sufficiently Consider Paragraph C Criteria**

In determining that plaintiff was not per se disabled, the ALJ did not sufficiently explain the basis for his conclusions. At step three of the analysis, ALJ Solomon's only mention of the C criteria is the following statement: "I have also considered whether the 'paragraph C' criteria are satisfied. In this case,

the evidence fails to establish the presence of the 'paragraph C' criteria." (Id. at 39).

The Second Circuit requires more explanation than vague and conclusory statements on key determinations of disability. Ferraris, 728 F.2d at 586. Under paragraph C, a claimant with an organic mental disorder is disabled if she has a

> Medically documented history of a chronic organic mental disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: 1. Repeated episodes of decompensation, each of extended duration; or 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. 404, Subpart P, Appendix 1 § 12.02(C). Plaintiff's record clearly shows a documented history of chronic mental disorder, lasting longer than two years, that has caused more than minimal limitations on her ability to do basic work activities. The record also clearly shows that plaintiff's symptoms seem to at least partially abate with regular therapy and compliance with prescribed medication. (See, e.g., Tr. 181).

81

The issue of decompensation, and whether plaintiff's multiple hospitalizations qualify as "repeated episodes" of "extended duration", is less clear. "Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." 20 C.F.R. Pt. 404, Subpart P, App. § 1.C(4). "The term repeated episodes of decompensation each of extended duration in these listings means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." Id. If a claimant experiences "more frequent episodes of a shorter duration or less frequent episodes of a longer duration," a determination must be made as to whether the "duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence." Id.; see also Walterich v. Astrue, 578 F. Supp.2d 482, 508 (W.D.N.Y. 2008) (finding the claimant to be disabled under paragraph C criteria where she had multiple frequent panic attacks of short duration).

The ALJ failed to do the requisite analysis regarding any of the factors for applying the paragraph C criteria. Thus,

82

plaintiff's many documented psychiatric hospitalizations, as well
as her documented inability to function outside of a highly
supportive living arrangement -- facts highly relevant to a
paragraph C determination -- were not considered. This failure is
another reason we recommend remand. See, e.g., Lewis v. Astrue,
2013 WL 5834466, at *31 (S.D.N.Y. Oct. 30, 2013) (remanding where
court found the ALJ's lack of explanation regarding paragraph C
criteria necessitated remand).


    Finally, the ALJ neglected completely to consider the
criteria for "schizophrenic, Paranoid and Other Psychotic
Disorders" under 20 C.F.R. 404, Subpart P, App'x 1 § 12.03, despite
the fact that the administrative record is replete with evidence
of symptoms consistent with one or more of these disorders --
namely plaintiff's frequent delusions, paranoia, illogical
thinking, and emotional withdrawal. See id. at § 12.03(A)(1), (3),
(4). (See, e.g., Tr. 166, 183, 195, 275, 423, 424, 439). Further,
plaintiff has been diagnosed by multiple mental health
professionals with schizophrenia (Tr. 164), paranoid schizophrenia
(id. at 227, 433), and schizoaffective disorder. (Id. at 411). The
ALJ's omission of these documented symptoms and diagnoses and his
failure to discuss the § 12.03 criteria are yet another reason for
recommending remand.

## D. **The ALJ's Failure to Assess Plaintiff's Credibility**

The ALJ exercises discretion over the weight assigned to a claimant's testimony regarding the severity of her pain and other subjectively perceived conditions and her resulting limitations. See, e.g., Schultz v. Astrue, 2008 WL 728925, at *12 (N.D.N.Y. Mar. 18, 2008) (citing Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979); Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999). Where the ALJ's findings are supported by substantial evidence, a reviewing court must uphold his decision to discount plaintiff's testimony. See Marcus, 615 F.2d at 27 (citing Richardson, 402 U.S. at 401).

Nonetheless, the ALJ's discretion is not unbounded. The Second Circuit has held that throughout the five-step process "'the subjective element of [plaintiff's symptoms] is an important factor to be considered in determining disability.'" Perez v. Barnhart, 234 F. Supp.2d 336, 340 (S.D.N.Y. 2002) (quoting Mimms v. Heckler, 750 F.2d 180, 185 (2d Cir. 1984)); see also 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3) ("We will . . . consider descriptions and observations of [a claimant's] limitations from [her] impairment(s), including limitations that result from [her] symptoms, such as pain, provided by [that claimant]"). In assessing

84

a claimant's testimony, the ALJ must take all pertinent evidence into consideration. E.g., Perez, 234 F. Supp.2d at 340-41. Even if a claimant's account of subjective symptoms is unaccompanied by positive clinical findings or other objective medical evidence[33], it may still serve as the basis for establishing disability as long as the impairment has a medically ascertainable source. See, e.g., Harris v. R.R. Ret. Bd., 948 F.2d 123, 128 (2d Cir. 1991) (citing Gallagher v. Schweiker, 697 F.2d 82, 84-85 (2d Cir. 1983)).

SSA regulations outline a two-step framework under which an ALJ must evaluate a claimant's subjective description of her impairment and related symptoms. 20 C.F.R. §§ 404.1529, 416.929; see also SSR 96-7(p). "First, the ALJ must consider whether the claimant has a medically determinable impairment which could reasonably be expected to produce the . . . symptoms alleged by the claimant." Martinez v. Astrue, 2009 WL 2168732, at *16 (S.D.N.Y. July 16, 2009) (alteration in original) (citing McCarthy

---

[33] Objective medical evidence is "evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1529(c)(2); see also Casino-Ortiz v. Astrue, 2007 WL 2745704, at *11 (S.D.N.Y. Sept. 21, 2007) (quoting 20 C.F.R. § 404.1529(c)(2)). Laboratory findings "are anatomical, physiological, or psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques. Some of these diagnostic techniques include chemical tests, electrophysiological studies, [X-rays], and psychological tests." 20 C.F.R. § 404.1528(c).

v. Astrue, 2007 WL 4444976, at *8 (S.D.N.Y. Dec. 18, 2007)); see also 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1). "Second, the ALJ must 'evaluate the intensity and persistence of those symptoms considering all of the available evidence.'" Peck v. Astrue, 2010 WL 3125950, at *4 (E.D.N.Y. Aug. 6, 2010) (citing C.F.R. § 414.1529(c)(3)(i)-(vii)). "To the extent that the claimant's 'contentions are not substantiated by the objective medical evidence,' the ALJ must evaluate the claimant's credibility." Peck, 2010 WL 3125950, at *4 (citing C.F.R. § 404.1529(c)); see also Meadors v. Astrue, 370 F. App'x 179, 183-84 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(c)(3)(i)-(vii); Taylor, 83 F. App'x at 350-51). It should be noted that "the second stage of [the] analysis may itself involve two parts." Sanches v. Astrue, 2010 WL 101501, at *14 (S.D.N.Y. Jan. 12, 2010). "First, the ALJ must decide whether objective evidence, on its own, substantiates the extent of the alleged symptoms (as opposed to the question in the first step of whether objective evidence establishes a condition that could 'reasonably be expected' to produce such symptoms)." Id. "Second, if it does not, the ALJ must gauge a claimant's credibility regarding the alleged symptoms by reference to the seven factors listed [in 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3)]." Id. (citing Gittens v. Astrue, 2008 WL 2787723, at *5 (S.D.N.Y. June 23, 2008)). If the ALJ does not follow these

86

steps, remand is appropriate. Id. at *15 (citing 20 C.F.R. §
404.1529(c)).


When a claimant reports symptoms more severe than medical
evidence alone would suggest, SSA regulations require the
reviewing ALJ to consider specific factors in determining the
credibility of a claimant's symptoms and their limiting effects.
SSR 96-7(p). These factors include: (1) an individual's daily
activities; (2) the location, duration, frequency and intensity of
pain or other symptoms; (3) factors that precipitate and aggravate
those symptoms; (4) the type, dosage, effectiveness, and side
effects of medication the individual takes or has taken to
alleviate pain or other symptoms; (5) treatment, other than
medication, that the individual receives or has received for pain
or other symptoms; (6) measures other than treatment the individual
uses or has used to relieve pain or other symptoms; and (7) other
factors concerning the individual's functional limitations and
restrictions due to pain or other symptoms. 20 C.F.R. §
404.1529(c)(3); see also Bush, 94 F.3d at 46 n.4; Wright v. Astrue,
2008 WL 620733, at *3 (E.D.N.Y. Mar. 5, 2008) (citing SSR 96-
7(p)).[34]

---

[34] SSR 96-7(p) states, in pertinent part, "in recognition of the
fact that an individual's symptoms can sometimes suggest a

Finally, "'[o]nly allegations beyond what is substantiated by medical evidence are to be subjected to a credibility analysis . . . [because requiring] plaintiff to fully substantiate [her] symptoms with medical evidence would be both in abrogation of the regulations and against their stated purpose." Martin v. Astrue, 2009 WL 2356118, at *10 (S.D.N.Y. July 30, 2009) (citing Castillo v. Apfel, 1999 WL 147748, at *7 (S.D.N.Y. Mar. 18, 1999)).

ALJ Solomon did not explicitly engage in a credibility analysis and failed to credit plaintiff's subjective reporting of symptoms in his findings. To bolster his determination that plaintiff was not markedly limited in social functioning and activities of daily living, the ALJ stated that "[c]laimant can care for her personal needs, attend medical appointments, do household chores, and food shopping." (Tr. 39). This finding is directly contrary to the evidence in the record. Thus, the ALJ neglected to mention that plaintiff testified that she stays at home most or all of the time (id. at 15) because of her paranoia

---

greater level of severity of impairment than can be shown by the objective medical evidence alone, 20 C.F.R. sections 404.1529(c) and 416.929(c) describe the kinds of evidence, including the factors below, that the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements."

(id. at 16), that she cannot go out to get her own medication because she is "afraid sometimes that [] a car might hit [her] in the street (id. at 18), that she has problems going outside by herself (id.), that she is unable to take public transportation by herself because she is afraid of terrorism or of being robbed or assaulted (id. at 20, 21, 24), that she does not leave the house for anything other than for her medical appointments (id. at 21), that she does not prepare meals for herself (id. at 24), and that her children do her grocery shopping. (Id. at 17-18, 24). When at home, she testified, she mostly watches television and frequently stays in bed all day. (Id. at 22, 24). She also testified that her two adult children "take care" of her, doing her food shopping at the supermarket, washing her clothing, and dispensing her medication. (Id. at 17-18). She further testified that she feels more secure in a hospital than at home, because the nurses give her food, help her, and "do everything" for her. (Id. at 27).

Plaintiff's testimony is, at the very least, inconsistent with ALJ Solomon's findings, but he does not address this discrepancy nor does he engage in any discussion of why he found plaintiff's account to be "not fully credible." (Id. at 43). It is clear that the ALJ discredited plaintiff's testimony when making his determination that she was not disabled, but in doing so he

89

failed to take into explicit account all pertinent evidence in the record. See, e.g., Perez, 234 F. Supp.2d at 340-41. This failure to assess plaintiff's credibility or to engage in any analysis regarding why plaintiff's testimony was not credible necessitates remand.

### E.  The ALJ's Erroneous Determination Regarding Plaintiff's Noncompliance with Medication and Treatment

In making the determination that plaintiff is not disabled, the ALJ relied in part[35] on her repeated failure to take her prescribed medication. (Tr. 40-43). While noncompliance with a prescribed medication regimen may justify a denial of benefits, an ALJ making such a ruling must satisfy certain requirements set forth in SSR 82-59. That ruling provides that:

> [The SSA] may make a determination that an individual has failed to follow prescribed treatment only where all of the following conditions exist:
> 1. The evidence establishes that the individual's impairment precludes engaging in any substantial gainful activity . . .; and
> 2. The impairment has lasted or is expected to last for 12 continuous months from onset of disability or is expected to result in death; and
> 3. Treatment which is clearly expected to restore capacity to engage in any [substantial gainful activity] has been prescribed by a treating source; and
> 4. The evidence of record discloses that there has been refusal to follow prescribed treatment. Where SSA makes a determination of "failure," a determination must also be

---

[35] In his decision, the ALJ stated that plaintiff's noncompliance was "of significance" and "noteworthy." (Id. at 42-43).

made as to whether or not failure to follow prescribed
treatment is justifiable.

SSR 82-59, 1982 WL 31384 (1982).

As for whether failure to comply with a medication regimen
"is justifiable", "[i]t is very important that the individual fully
understand the effects of failure to follow prescribed treatment."
Id. Thus, SSR 82-59 "emphasize[s] that the ALJ must provide [the]
claimant with (i) notice of the effect of noncompliance on his or
her application for benefits, (ii) occasion to explain any seeming
noncompliance, and (iii) opportunity to undergo the prescribed
treatment." Grubb v. Apfel, 2003 WL 23009266, at *5 (S.D.N.Y. Dec.
22, 2003).

When an ALJ uses noncompliance with a medication regimen as
an express or implied basis for denying benefits, the requirements
set forth in SSR 82-59 must be met. See, e.g., Belen v. Astrue,
2011 WL 2748687, at *13 (S.D.N.Y. July 12, 2011); Benedict v.
Heckler, 593 F. Supp. 755, 759 (E.D.N.Y. 1984). The "burden of
producing evidence concerning unjustified noncompliance lies with
the Secretary." Grubb, 2003 WL 23009266, at *7. Moreover, "[w]hen
considering noncompliance with treatment, mental impairments
require a different standard than physical impairments. When a

91

plaintiff refuses to follow a treatment regimen, the 'refusal . . . must be reasonable,' but the 'reasonable man' standard which is normally used in determining justifiable cause for refusal is 'clearly not applicable' to those persons who, because of mental impairments, are not 'reasonable.'" Belen, 2011 WL 2748687, at *13 n.13 (quoting Benedict, 593 F. Supp. at 761). See also Frankhauser v. Barnhart, 403 F. Supp.2d 261, 278 (W.D.N.Y. 2005) ("Courts considering whether a good reason supports a claimant's failure to comply with prescribed treatment have recognized that psychological and emotional difficulties may deprive a claimant of 'the rationality to decide whether to continue treatment or medication.'") (quoting Thompson v. Apfel, 1998 WL 720676, at *6 (S.D.N.Y. Oct. 9, 1998))). For this reason, "[i]n cases involving the mentally ill, 'justifiable cause' must be given a more lenient, subjective definition." Benedict, 593 F. Supp. at 761.

SSR 96-7P provides that the ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." SSR 96-7P, 1996 WL 374186, at *7 (1996). This rule has particular

importance in cases involving a mental impairment, and courts have criticized the use of treatment noncompliance to reject mental complaints, "both because mental illness is notoriously underreported and because it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation." Day v. Astrue, 2008 WL 63285, at *5 n.7 (E.D.N.Y. Jan. 3, 2008) (citations omitted). Courts have recognized that those suffering from mental illness may be much less likely to accept treatment prescribed by doctors, and that a failure to comply with medical treatment may be a function of particular mental diseases, in which case the claimant's refusal to take the prescribed medication should not be a basis to discount the seriousness of the underlying condition. See, e.g., Roat v. Barnhart, 717 F. Supp. 2d 241, 266 (N.D.N.Y. 2010); Benedict, 593 F. Supp. at 761 (discussing how those with mental illnesses are "unlikely to accept treatment prescribed by doctors", but such predispositions should not automatically result in a denial of benefits because that would "mock[] the idea of disability based on mental impairments."). In order to make this determination, the ALJ "may need to recontact the individual or question the individual at the administrative proceeding in order to determine whether there are good reasons the individual [did] not . . . pursue treatment in a consistent manner." SSR 96-7P.

Here, ALJ Solomon failed on multiple fronts. First, there is no evidence in the administrative record that the ALJ gave proper notice to plaintiff that her noncompliance with treatment could lead to an adverse decision on benefits. Second, the ALJ did not ask plaintiff about possible reasons for her failure to comply with her prescribed medication regime, even when the topic was raised by plaintiff's representative at the administrative hearing. (Tr. 25-26). Third, the ALJ neglected to question a treating source or other medical expert as to whether plaintiff's failure to fully comply with her prescription medication regimen was at all attributable to the nature of plaintiff's mental disorder. See, e.g., Frankhauser, 403 F. Supp.2d at 278. Fourth, the ALJ neglected to make a necessary determination of whether plaintiff's noncompliance with treatment was justified. All of these failures compel remand.

A review of the record shows several factors that may reasonably explain plaintiff's failure to follow prescribed treatment, none which reflect negatively on plaintiff's credibility, and -- to the contrary -- a number of which may reflect her mental illness. At the administrative hearing, plaintiff testified that she suffers from paranoia, which makes it difficult for her to go outside by herself, and stated, "I don't

like to feel like this, but I think it's the medication." (Tr. 18). The ALJ then asked whether she had discussed the fact that she believed the medication was the problem with her doctor, and she answered that the doctor had told her that the medication was not the problem. (Id.). She later stated that her medication "make[s] her shaky" and she "cannot see clearly." (Id. at 21). Indeed, on November 6, 2010, plaintiff was admitted to New York Presbyterian Hospital with complaints that she "felt like a zombie" on her prescribed Abilify medication, and reported symptoms of stiffness, tremulous extremities, and increased urinary frequency. (Id. at 178).

When asked specifically about medication noncompliance by her representative during the hearing, plaintiff testified that she stops taking her medication "because I want to feel well." (Id. at 25). Plaintiff's documented issues with the side effects of her medication could explain her reluctance to stay on the prescribed regimen. See, e.g., Iuteri v. Barnhart, 2004 WL 1660580, at *12 (D. Conn. Mar. 26, 2004) (noting that "the individual may not take prescription medication because the side effects are less tolerable than the symptoms" and that this could qualify as a justifiable reason for noncompliance). It is also possible that plaintiff's documented paranoia and anxiety were factors in her

noncompliance. See, e.g., id. ("while the average person may not fear such side effects, it is well-documented that plaintiff suffers from anxiety and panic disorder that could reasonably cause her to fear side effects, and thus not follow a prescribed course of treatment.").

There are repeated instances in the record where plaintiff did not show up for a medication evaluation by her treating physician. (See, e.g., Tr. 424, 429, 435, 440, 447). However, plaintiff testified that she relies on her children to pick up her medication because she has trouble leaving the house alone. (See id. at 18, 21). She also testified that she rarely leaves the house for anything other than her medical appointments, stating that she had to "force" herself to go, because she feels "protected" at home. (Id. at 25). This difficulty, consistent with the symptoms of her illness, could cause her to miss doctor's appointments necessary to renew prescriptions, and her inability to pick up her own medication could also explain her sporadic usage. (See id. at 18, 20).

The ALJ neglected to consider any of these factors, and indeed failed to make any determination as to whether plaintiff's noncompliance with medication and treatment was justified. This

necessitates remand. On remand, the ALJ should notify plaintiff of the effect that noncompliance may have on her application for benefits, and she must be "afforded an opportunity to undergo the prescribed treatment or to show justifiable cause for failing to do so." SSR 82-59. The ALJ must then make the determination whether plaintiff had justifiable cause for failing to comply with treatment, and when doing so, he must use the "more lenient" definition of justifiable cause as it applies to plaintiff's mental disorders.

## CONCLUSION

For the foregoing reasons, we recommend that defendant's motion be denied, and that the case be remanded for further administrative consideration of plaintiff's disability benefits application.

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable J. John G. Koeltl,

Room 1030, 500 Pearl Street, New York, New York, 10007, and to the chambers of the undersigned, Room 1670, 500 Pearl Street, New York, New York, 10007. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. See Thomas v. Arn, 474 U.S. 140, 150 (1985); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(d).

**DATED: New York, New York**
**June 13, 2014**

**RESPECTFULLY SUBMITTED,**

**MICHAEL H. DOLINGER**
**UNITED STATES MAGISTRATE JUDGE**

98

Copies of the foregoing Report & Recommendation have been
sent today to:

Susan D. Baird, Esq.
U.S. Attorney's Office, SDNY
One St. Andrew's Plaza
New York, NY 10007

Ms. Awilda Ivette Cordero
535 West 151st Street
Apt. 3B
New York, NY 10031